27 C.C.P.A.(Patents)

### WILLIAM S. MERRELL CO. v. ANACIN CO.

### Patent Appeal No. 4133.

Court of Customs and Patent Appeals.

Feb. 5, 1940.

Murray, Sackhoff & Paddack, of Cincinnati, Ohio, for appellant.

Edward S. Rogers, William T. Woodson, and James H. Rogers, all of Chicago, Ill., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is an opposition proceeding filed by the opposer-appellee, the Anacin Company, hereinafter referred to as the opposer, against the registration by the William S. Merrell Company, applicant-appellant, hereinafter referred to as applicant, of the trade-mark "Alycin" for use upon "a preparation for the treatment of com-mon colds, neuralgia complaints, rheumatism, arthritic conditions and the like."

The record shows that the applicant applied for registration of its trade-mark "Alycin" under the Trade-Mark Act of February 20, 1905, as amended, alleging use since April 1930, and that upon notice being given, opposer filed its notice of opposition based upon its prior use of its registered trade-marks, No. 123,606 of November 19, 1918, for the word "Anacin" and the other, No. 187,621 of August 5, 1924, for the word "Anacin" upon a triangular shield-like background. It alleged that its marks were so similar to the mark of applicant that when used upon its goods—"a medicinal preparation for internal use in cases of headache, neuralgia, and pains centering on the trigeminal nerve"—which, it alleged, were similar to those of applicant, there would be a likelihood of confusion or mistake in the minds of the public or of deceiving purchasers.

The applicant answered the notice of opposition, denied each of the allegations therein except that the two said trade-marks mentioned in the notice of opposition had been issued by the United States Patent Office, and filed affirmative grounds of defense alleging a difference in the marks and goods and denying the likelihood of confusion.

Testimony was taken by both parties. The opposer introduced the testimony of one witness, F. J. Reynolds, vice-president of the Anacin Company since January 1933. He stated that he had been connected with the Anacin Company in another capacity since March 31, 1930; that he was familiar with the records of the Anacin Company whose sole business was manufacturing a tablet which was prescribed by the medical and dental professions for the relief of pain due to headache, neuralgia, neuritis, and for pain associated with or caused by tooth extraction; that the product is sold over a trademark which consists of the shield device and the word "Anacin" for the 25 cent size (12 tablets) packages and the word "Anacin" without the shield for the 50 tablet size. He produced specimens of the trade-mark as used by his company which were filed as exhibits. The following is quoted as part of his testimony:

"Q. 21. How long has The Anacin Company and its predecessor used the word Anacin as a trade-mark for its product?

"A. The trade-mark Anacin was first registered by William H. Knight on November 19, 1918.

"Mr. Zugelter: The answer is objected to as being non-responsive to the question.

"A. Under No. 123606. This trade-mark was assigned to The Anacin Chemical Company on August 13, 1920. It was later assigned to the Heidbrink Company on February 23, 1923. * * *

"Mr. Woodson: Will you please satisfy counsel as to what the document is which you hold in your hand? A. It is simply a memorandum which I had written as a result of examining the records of The Anacin Company.

"Q. 22. Did you examine the records yourself? A. I did.

"Q. 23. And this memorandum contains information which you yourself took from the records of opposer? A. Yes.

"Mr. Zugelter: The testimony is objected to as not the best evidence.

"Mr. Woodson: If counsel insists we will adjourn the hearing and ask that the witness bring down the records of the company from which he obtained the information.

"Mr. Zugelter: It is submitted that the mere production of records by this witness who apparently knows nothing of the business affairs of the opposer company prior to 1930, is incompetent.

"Mr. Woodson: I don't consider that that is an answer to my question and repeat if counsel desires an adjournment so that the witness can bring in the records of the company.

"Mr. Zugelter: There is no obligation on counsel for the applicant to make any commitment. Opposer's counsel knows what is proper and competent evidence.

"Mr. Woodson: Since opposer's counsel has not stated that he desires an adjournment for the production of the records, we will proceed.

"Q. 24. Had you finished your last answer, Mr. Reynolds? A. No, I don't think I had. This trade-mark was assigned to The Anacin Chemical Company on January 2, 1926, and to The Anacin Company on October 7, 1927. There have been various other registrations since then such as An-A-cin and device, and Anacin and shield device which is a color registration.

"Mr. Zugelter: Same objection.

"Q. 25. Your answer to my last question gives the history of the registration of the trade-mark Anacin. Was the trade-mark used by the opposer and its predecessor during the period which you have just mentioned in your last answer? A. It was.

"Mr. Zugelter: Question and answer objected to as calling for and being hearsay.

"Q. 26. When was the trade-mark Anacin first used by the opposer's predecessor in business? A. On January 1, 1916.

"Mr. Zugelter: The question and answer objected to. It is obvious that the witness has no knowledge of the facts to which he is testifying except as same may be hearsay.

"Mr. Woodson: I am willing to stipulate that it will be understood from now on that all questions asked this witness are objected to by opposing counsel. I make this offer to save time.

"Mr. Zugelter: The offer is accepted in so far as the objections may be proper to the examination of this witness.

"Q. 27. Do the records of the opposer and its predecessor show that the trade-mark Anacin has been used continuously by opposer and its predecessor from 1918 to date? A. They do.

"Q. 28. Did you examine the records yourself to obtain that information? A. I did.

"Q. 29. I understand from your previous answer that the trade-mark Anacin was first used by William M. Knight, is that right? A. It is.

"Q. 30. What concern or company succeeded to the business of William M. Knight? A. The Anacin Chemical Company which was first incorporated in Minnesota on December 4, 1918.

"Q. 31. Did William M. Knight assign The Anacin Chemical Company the trade-mark Anacin and the good will and the business connected with that trade-mark? A. William M. Knight assigned the trade-mark to The Anacin Chemical Company on September 7, 1920. It was later assigned to the Heidbrink Company on February 23, 1923.

"Q. 32. Did the said assignment include the good will and the business connected with the trade-mark? A. It did.

"Q. 33. Did The Anacin Chemical Company assign the trade-mark Anacin and the

good will and business connected therewith to the Heidbrink Company? A. Yes.

"Q. 34. What was that date? A. February 23, 1923.

"Q. 35. What company, if any, succeeded the Heidbrink Company? A. The Anacin Chemical Company and The Anacin Company.

"Q. 36. On what date did The Anacin Chemical Company succeed to the business of the Heidbrink Company? A. The Anacin Chemical Company succeeded to the business of the Heidbrink Company on January 2, 1926.

"Q. 37. What company, if any, succeeded to the business of The Anacin Chemical Company? A. The Anacin Company succeeded to the business of the Anacin Chemical Company.

"Q. 38. On what date? A. On October 7, 1927.

"Q. 39. Is The Anacin Company that succeeded to the good will and business of The Anacin Chemical Company, the opposer in this case? A. It is.

"Q. 40. Did The Anacin Chemical Company assign to The Anacin Company the trade-mark Anacin—A. It did.

"Q. 41—and the good will and business pertinent thereto? A. It did.

"Q. 42. Did opposer continue the business of The Anacin Chemical Company? A. Yes.

"Q. 43. Did it continue to use the trade-mark Anacin? A. Yes.

"Q. 44. Is opposer using the trade-mark Anacin at the present time? A. Yes.

"Q. 45. Has the opposer used the trade-mark Anacin continuously since it obtained the mark and the good will and business *ap*pertinent thereto from The Anacin Chemical Company?

"Mr. Zugelter: In addition to the continuing objection, objection is noted to the leading character of the examination.

"A. We have.

"Q. 46. When you say, we have, you mean the company? A. The company. * * *

"Q. 48. Has this product been the same from its first use down to the present? A. Yes.

"Q. 49. Does the opposer use the trademark Anacin upon any other product? A. No.

"Q. 50. Are all the activities of The Anacin Company devoted to the manufacture and sale of this product? A. All of the activities of The Anacin Company are devoted to the manufacture and sale of Anacin.

"Q. 51. Is The Anacin Company's entire production of its product sold under the trade-mark Anacin? A. Yes.

"Q. 52. How far back do the sales records of The Anacin Company go? A. The sales records go back to 1919.

"Q. 53. Have you compiled any figures as to the annual volume of sales of Anacin in dollars from 1919 down to and including the year 1935? A. Yes.

"Q. 54. Will you please give us those sales by years? A. [Here follows a statement showing by years steadily increasing sales beginning with less than a thousand dollars in 1919 and continuing to over a million dollars in 1935]"

Attention is called to question 45 and the answer thereto: "Q. 45. Has the opposer used the trade-mark Anacin continuously since it obtained the mark and the good will and business *ap*pertinent thereto from The Anacin Chemical Company? * * * A. We have." and to the answer to question 37 where it was stated that the opposer had succeeded to the business of the Anacin Chemical Company on October 7, 1927. Following this, the witness was asked if the product had been the same from its first use down to the present and he answered in the affirmative. When asked if the company had used the trade-mark "Anacin" upon any other product, the answer was "No."

Most of the remainder of the testimony of the witness is directed to describing the qualities of the medicinal preparation "Anacin" and the extent of its sale and advertisement, which advertising reached as high as $65,000 per month. He testified that William M. Knight runs a retail drug store in Minnesota and that the Heidbrink Company is still in business but he stated nothing further as to the nature of such business. (Both Knight and the Heidbrink Company were referred to in his testimony as being assignors of the above-referred-to "Anacin" trade-marks to the opposer's predecessors). He stated that "Anacin" was competitive with aspirin.

The testimony of applicant's witnesses goes to the nature of the goods upon which

the trade-mark "Alycin" is used and the manner of its sale, etc.

The record as a whole shows that "Anacin" is competitive with aspirin, that it is used to allay pain such as headache and toothache and may be purchased at drug stores without a prescription, and that it is also prescribed by dentists and physicians. It is shown in applicant's record that "Alycin" is a so-called "ethical" drug and while it is used to relieve pain arising from neuralgia, arthritis, common colds, etc., it is not consumed by the purchaser from the original package but is used upon prescription of a physician and taken from the container kept in the drug store.

It was held by concurring decisions of the Examiner of Interferences and the Commissioner of Patents that certain certified copies of assignments recorded in the Patent Office, which were filed with the notice of opposition and appear in the record, being relied upon to prove chain of title, were insufficient to prove ownership of the trade-marks.

The opposer moved to reopen the case so that it might offer further proof of the chain of title of its marks. The tribunals again concurred in the ruling that there were no sufficient grounds shown in the motion to warrant reopening the case.

Apart from the question of ownership of the marks which opposer pleaded, the tribunals of the Patent Office held as a matter of ex parte consideration that the word "Alycin" should be denied registration because they were of the opinion that confusion would result by its concurrent use with the registered "Anacin" marks.

In this court, the applicant has argued at great length that the record contains no proper evidence of use of the term "Anacin" upon the said medicinal product prior to April 1930, which is the first use claimed by applicant.

The first question to decide is: Does the record at bar show a prior use upon the part of the opposer of its "Anacin" trade-marks on its said medicinal product? After examining the record carefully and considering all the arguments made, we are of the opinion that it does and that the tribunals properly sustained the opposition.

It is to be noted, however, that opposer's counsel in interrogating its sole witness, F. J. Reynolds, failed in many instances to definitely fix the time and the character of use, especially when referring to a use prior to March 31, 1930. In substance the witness testified that the trade-marks were used during a long period of time by the opposer, some of which period antedated applicant's use of its mark, and the only objection made to his testimony as to the period from March 31, 1930, to the date of testifying was that during a portion of that time he was not acting as vice-president of the company but was connected with it in another capacity not disclosed. He testified that his company had no other business. He showed that The Anacin Company was so named and incorporated September 30, 1927. He gave the sales of the company and its predecessors by year beginning with the year 1919.

We are of the opinion that such testimony under the circumstances at bar should be held sufficient to warrant a holding that the opposer has proved a priority of use in the instant proceeding.

It must be conceded, as before stated, that the testimony relating to the chain of title and the particular, precise use of the trade-marks involved on the particular goods involved prior to March 31, 1930, is not as definite and specific as it might have been, and under certain circumstances, it might be held that it does not meet the requirements of the law, but it is to be noted that the failure of making more precise proof, if it existed, is explained, to some extent, by the rejection of the proof which was depended upon to prove the chain of title. Moreover, it is to be noted that there are no contradictions or inconsistencies in the testimony of the witness and that there is nothing in the record which is inconsistent with the conclusion that opposer had used the trade-marks continuously upon the particular goods in controversy since March 31, 1930, which is prior to any date claimed by the applicant.

The Examiner of Interferences after holding that the proof relating to the chain of title by filing the certified copies of the recorded assignments was insufficient to prove ownership, held that the proof was sufficient to prove use of the "Anacin" trade-marks by the opposer from March 31, 1930. In affirming the decision of the Examiner of Interferences in this respect, the Commissioner of Patents in part said:

"Opposer's only witness was its vice-president, F. J. Reynolds. He stated that

he had held that position since January, 1933, and had 'been connected in another capacity with The Anacin Company since March 31, 1930.' Applicant now challenges his competency to testify, as he did, to opposer's use of its trade-mark as of any date prior to his becoming an officer of the company; and points out that he may have been 'connected' with opposer without being in a position to know the details of its business. When the testimony was given, however, the only objection interposed in relation to this particular subject matter was that such testimony was hearsay 'as to events transpiring prior to his connection with the present company;' and that was likewise the only objection that appears to have been urged before the examiner of interferences. Moreover it does not affirmatively appear that Mr. Reynolds did not have personal knowledge of opposer's use of the mark from the beginning of his connection with the company, and his lack of such knowledge may not be presumed. See 22 C.J. 215, where the rule is stated as follows:

" 'While it has been asserted that the testimony of a witness should not be received unless it first appears that he is prepared to testify from his own knowledge, the more generally accepted view is that, where the matter in controversy is such that the witness may have personal knowledge and it does not affirmatively appear that he speaks from hearsay, his testimony should be received, subject to be stricken out if it subsequently appears to be objectionable under the hearsay rule.'

"Opposer having thus shown its own use to have commenced at least a month earlier than any use established by applicant, and there being no serious dispute as to the similarity of the two marks, the only remaining question in issue between the parties is whether or not their goods are of the same descriptive properties within the meaning of the Trade-Mark Act. * * *"

For reasons stated by the commissioner and the reasons expressed hereinbefore, we are in agreement with the findings of the tribunals.

■ As to the similarity of the trade-marks, little need be said on the subject. The terms "Anacin" and "Alycin" are so alike in every particular as to call for no analysis here. The goods, we think, are quite similar. Both are used to accomplish substantially the same purpose—to relieve pain. They are both handled in drug stores; are both medicinal preparations; and we think are goods of the same descriptive properties within the meaning of the statute. The fact that one is a so-called "ethical" preparation and the other sold, for the most part, over the counter to the consumer does not change the situation. Moreover, trade practices frequently change.

As before stated, registration has been denied by the Patent Office tribunals upon the ex parte consideration of the application without regard to the merits of the opposition proceeding and if the correctness of the conclusions of the Patent Office and of this court as to the opposition proceeding were in doubt, it would not be a matter of consequence, since we agree with the Patent Office tribunals on their finding with respect to the right to register as an ex parte question.

The marks and goods of the parties being similar in a trade-mark sense, we think there would be a likelihood of confusion resulting from the concurrent use of the marks as shown, and that the commissioner did not err in affirming the decision of the Examiner of Interferences.

The decision of the Commissioner of Patents is affirmed.

Affirmed.