## B. R. BAKER CO. v. LEBOW BROS.

Patent Appeal No. 5030.

Court of Customs and Patent Appeals.
June 25, 1945.

James Atkins, of Washington, D. C., for appellant.

Mason, Porter & Diller, of Washington, D. C. (Herbert H. Porter and Charles R. Allen, both of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

This is an appeal in a Patent Office trade-mark interference proceeding between appellant (hereinafter referred to as Baker) and appellee (hereinafter referred to as Lebow). The appeal is from the decision of the Commissioner of Patents, speaking through the First Assistant Commissioner, 60 USPQ 254, reversing the decision of the Examiner of Trade-mark Interferences, who had held Baker to be the first user and owner of the involved trademark and that Baker was entitled to register the same.

Baker's mark is a composite one, consisting of the words "Custom Imperial" at the top and the words "The B. R. Baker Co." at the bottom. Between the two lines of printing, there appears what Baker states is "a crest, a sort of a coat of arms, with a design of needle and thread, a spool of thread and a shears, a bolt of cloth and a spinning wheel." Lebow has two registrations involved in the interference, the first consisting of the words "Imperial Drape" ("Drape" disclaimed), registration No. 297,734, September 27, 1932, application for which was filed February 29, 1932, and the second consisting of the words "Custom Imperial" and other indicia not regarded as important here, registration No. 381,259, September 17, 1940, application filed April 1, 1940.

No question is raised as to the similarity of the marks or the identity of the goods of the parties. The only issue tried below and presented here is whether or not the proof appearing in the record introduced by Baker (Lebow took no proof and relied upon its filing date, February 29, 1932, of the "Imperial Drape" mark) is sufficient to prove priority of adoption and use of its said mark.

Baker's proof consists of the testimony, in the form of a deposition, of a single witness, Frank P. Baker, Vice-President and General Superintendent of the appellant company, and six exhibits which will be particularly described hereinafter.

We quote extensively from the nine pages of testimony the following, which we think is pertinent to the decision of the issue:

"Q9. And have you been general superintendent continuously ever since January 5, 1930? A9. Yes, sir.

"Q10. When did The B. R. Baker Company first use the trade name 'Custom Imperial'? A10. As near as I can remember, it was 1928–1929 that we started to use it and, of course, the proof that we have here is 1930.

"Q11. Will you please state fully how the use of the trade mark or trade name 'Custom Imperial' first came about, that is, the use by The B. R. Baker Company? A11. Well, at that time there was a great deal of cut, make and trim garments used by the firm. As cut, make and trim, we bought the material and had the clothes made; one shop made the trousers and another shop made the coats, and we had to have some kind of a brand or make for that clothing. We adopted for a short time 'Metropolitan Manor' which was given up and we used this label 'Custom Imperial' from that time on. We have changed the design of it from time to time but have stuck to rather a similarity of this one that we are using at the present time.

"Q12. Please state what connection you had with the first use of the trade mark 'Custom Imperial' by The B. R. Baker Company. A12. Well, the reason we gave up 'Metropolitan Manor' was we didn't think that had any meaning, and another store in Dayton, Ohio, called the 'Metropolitan Store' was using that label, and of course it was intended for their store and we were just copying their label, and we thought that the 'Custom Imperial' label would be a better name and had more of a significance with the clothing. The named applied more, and we had a discussion on that and were told to go ahead and get some samples of labels made, which we did.

\* \* \* \* \* \*

"Q23. You stated The B. R. Baker Company first used the trade-mark 'Custom Imperial' in 1928 or 1929 but that the records do not show that early a use. The adoption of this trade-mark which you have just told about occurred at about what time? A23. What time of the year?

"Q24. No; during what year and approximately what time of the year? A24. Well, I really couldn't answer that.

"Q25. Well, can you say approximately what year or time of year that you officially adopted this trade-mark 'Custom Imperial'? A25. No, I couldn't say just when.

"Q26. You have just testified, Mr. Baker, that you started using this trade mark in 1928 or 1929. Describe the use of the trade mark 'Custom Imperial' in 1928 and '29 by the B. R. Baker Company. A26. As I can remember, it seems to me it was in the Fall of one of those years because that was when Mr. O'Neil returned to the firm. He was absent for a while.

"Q27. I hand you a paper marked 'Exhibit No. 2.' Will you please tell what that paper is and from what file or record you procured that? A27. Well, this is an advertisement in the Toledo Times on January 5th.

"Q28. Of what year?' A28. 1930: It was a tear sheet taken from our tear sheet book.

"Q29. Was that a book regularly kept by The B. R. Baker Company as part of its records? A29. Yes.

"Q30. Does that advertisement of January 5, 1930, in the Toledo Times marked Exhibit No. 2 contain any advertisement of the trade mark 'Custom Imperial'? A30. Yes, it does, several times.

"Q31. Was the B. R. Baker Company on January 5, 1930, using the trade mark 'Custom Imperial' on its clothing? A31. Yes.

"Q32. On what clothing was it using the trade mark 'Custom Imperial'? A32. On what makes?

"Q33. On what garments? A33. On men's suits and top coats and also overcoats.

"Q34. And overcoats? A34. Yes, sir.

"Q35. Has the B. R. Baker Company used this trade mark since January 5, 1930? A35. We have been using it ever since.

"Q36. The use has been continuous ever since January 5, 1930? A36. Yes, sir.

Baker's application was filed August 23, 1940. In the application it was stated under oath that the "trade-mark has been continuously used and applied to said goods in applicant's business since November 26th 1936." On September 14, 1940, Baker amended its application, claiming first use on January 5, 1930.

The examiner's first action in rejecting Baker's application for registration of the mark was in view of five registered marks, the filing date of the earliest of which was February 29, 1932—that of Lebow. The examiner stated that the mark was passed to publication but was subject to interference. After Baker amended its application, it requested the interference, and the request was granted by declaring the present interference between Baker and Lebow.

It will be observed from the above-quoted testimony that the witness was testifying to events which occurred as far back as fourteen years, and that Baker, at one time before using the "Custom Imperial" mark, used a mark "Metropolitan Manor" upon the same kind of goods. It will also be observed that when first queried about the early use of the involved mark, the witness could not say approximately what year or time of year the mark was adopted. His answer to the question was, "No, I couldn't say just when." His counsel (Lebow was not represented and there was no cross-examination) then proceeded to ask him a number of leading questions. To counsel's leading question, "You stated The B. R. Baker Company first used the trademark 'Custom Imperial' in 1928 or 1929 but that the records do not show that early a use," the witness finally replied that he could not answer; and he was then asked whether he could state approximately what year, and he replied, "No, I couldn't say just when." Then counsel asked him this question, "You have just testified, Mr. Baker, that you started using this trade mark in 1928 or 1929. Describe the use of the trade mark 'Custom Imperial' in 1928 and '29 by the B. R. Baker Company," and the witness replied, "As I can remember, it seems to me it was in the Fall of one of those years because that was when Mr. O'Neil returned to the firm. He was absent for a while." There is nothing in the record to disclose when Mr. O'Neil returned to the firm, nor is it disclosed why O'Neil's return would refresh the memory of the witness that the mark was first used in a trade-mark sense in 1928 or 1929. The witness' later positive statements that the mark was used on clothing in 1930 and continuously thereafter must be considered in the light of all his testimony, which, for the most part, was responsive to questions unusually leading in character. Moreover, it was not definitely stated that the marks so used were their own or those of others.

Baker then introduced certain exhibits. Exhibit No. 1 is a piece of silk-satin cloth containing Baker's mark, which was to be attached to the inside pocket or some other place on a garment. There is no showing that this particular piece of cloth or one like it was used in a trade-mark sense on any of Baker's goods prior to the critical date of February 29, 1932.

Exhibit No. 2 is an advertisement in the Toledo Times, upon which so-called tear sheet appears, in green ink, a rubber-stamped date, "Times Jan 5 '30." This exhibit consists of what appears to be a half- or full-page advertisement of a clearance sale on the part of Baker, in which the following appears:

"This greatest of all clearances offers the finest of selections * * * Fashion Park and Custom Imperial Tailored suits and overcoats at clearance prices. * * If you want the superlative in style, qual-

ity and tailoring—and the superlative in fine values—here it is!"

It is not contended by Baker that this exhibit, which is an advertisement of "Custom Imperial" clothing, proves by itself a trade-mark use of the term, but it is relied upon as a circumstance corroborative of the witness Baker's oral testimony.

The examiner did not rely upon the rubber-stamped date in determining that the date had been sufficiently proved to warrant a consideration of the exhibit, but he found on the back of the exhibit a news item dated "London, Jan. 4" concerning a Naval Conference of the five Great Powers, of the date of which—1930—the examiner took judicial notice.

It will first be observed that Baker was advertising a clearance sale of "Fashion Park" and "Custom Imperial" tailored suits and overcoats. Baker does not claim to be the owner of the well-known "Fashion Park" mark, and there is nothing in the record to indicate that it was not selling "Fashion Park" and "Custom Imperial" tailored clothing under the trademarks of others. So, regardless of the date of issue of the newspaper in which the advertisement appears, we think the probative value of this exhibit, even for the purpose of corroboration or refreshing the memory, is negligible. Such exhibits should be explained. The use of the two trade-mark terms in the advertisement could have been explained, and in the absence of such explanation it is, in the present circumstances, entitled to but little consideration.

Exhibits 3, 4, 5, and 6 all relate to orders or acknowledgments of orders of labels or inventories of the same, containing the term "Custom Imperial," all of which transactions occurred in 1936 or 1937—which of course proves nothing relative to a trade-mark use of the term prior to the critical date of February 29, 1932. Moreover, this activity in 1936 and 1937 would seem to support the earlier sworn statement that Baker had used the mark since 1936.

Baker, without going into details, attempts to excuse the lack of earlier documents or records indicating use of the mark, by reason of the fact that they were destroyed when the company moved in 1931. Why or how they were destroyed is not disclosed. It is interesting to note, however, that the witness testified that Exhibit No. 2, which was dated January 5, 1930, was "a tear sheet taken from our tear sheet book" and stated that the book was regularly kept by Baker as a part of its records.

It has become well-settled law that one who seeks to prove priority of ownership and use of a trade-mark over the application date of a registered mark must do so by a preponderance of the evidence. Etablissments Rene Beziers, Societe Anonyme v. Reid, Murdoch & Co., 48 F.2d 946, 18 C.C.P.A., Patents, 1340. Of course, as against a registered mark, doubts are resolved against the junior party. Brewster-Ideal Chocolate Co. v. Dairy Maid Confectionery Co., 62 F.2d 844, 20 C.C.P.A., Patents, 848. Where, however, one has under oath stated his earliest use and then amends his oath and by proof attempts to show an earlier date, he is then under a heavy burden, and his proof must be "clear and convincing." National Dairy Products Corporation et al. v. Allied Mills, Inc., 30 USPQ 274, 27 T.M.Rep. 494; see Joannes Brothers Co. v. Jas. H. Forbes Tea and Coffee Co., 15 T.M.Rep. 177. The latter case was cited with approval by this court in the Brewster-Ideal Chocolate Co. case, supra. See also Mayer Fertilizer & Junk Co. v. Virginia-Carolina C. Co., 35 App.D.C. 425.

It is not contended by either party here that oral proof alone, even by one witness, if sufficiently probative, will not suffice in proving priority of ownership and use in a trade-mark interference proceeding. While the oral testimony of a single interested witness must necessarily have its weaknesses, we know of nothing in trade-mark law which justifies the rejection of such proof if it is sufficiently probative. However, such testimony is obviously strengthened by corroborative documentary evidence, and it should not be characterized by contradictions, inconsistencies, and indefiniteness but should carry with it conviction of its accuracy and applicability. William S. Merrell Co. v. Anacin Co., 109 F.2d 339, 27 C.C.P.A., Patents, 847. In one respect the general principle just announced is at variance with that which obtains in proving priority of invention in patent interferences. In the latter case corroboration is indispensable, while in the former it is not an absolute requisite. When, in cases like the one at bar, the oral testimony of a single witness, testifying long after the events happened, is relied upon to prove priority,

584

such testimony, while entitled to consideration, should be most carefully scrutinized; and if it does not carry conviction of its accuracy and applicability, it should not be permitted to thus successfully attack the presumed validity of a registered trademark. See Collins v. Hupp Motor Car Co., D.C., 4 F.2d 272; also T. H. Symington Co. v. National Malleable Castings Co., 250 U.S. 383, 39 S.Ct. 542, 63 L.Ed. 1045.

█ Whether or not the testimony of the single witness Baker, indefinite and uncertain as it is, together with the apparent lack of probative force to be given to the exhibits, is sufficient proof of priority in this case does not even present a close question. Here there was no cross-examination. Here the questions were leading. Here the witness was doubtful. Here he depended upon his memory, and the things relied upon to refresh the memory had little pertinency. Other circumstances herein pointed out, we think, suggest that the offered proof does not meet the heavy burden placed upon Baker.

The commissioner, in his decision, after setting out most of the testimony herein quoted, we think, aptly ruled with respect thereto when he said:

"I think the only fair inference to be drawn from this testimony is that Mr. Baker had no independent recollection as to the time when appellee first used the trade-mark upon its merchandise, but was merely assuming that it must have been in use when the advertisement, exhibit 2, was published. He did not even say that the exhibit refreshed his recollection. Moreover, it bears no date of publication other than the unexplained notation 'Times Jan 5 '30,' apparently impressed by means of a rubber stamp. When, by whom, or for what reason this was done, are questions to which the record affords no answer. The examiner of interferences found a news story on the reverse side of the exhibit bearing the date line 'London, Jan. 4,' and by taking judicial notice that the story related to a coming event of world importance that was then under discussion and that materialized shortly thereafter, he concluded that the date of publication was January 5, 1930. The witness, however, indulged in no such reasoning, nor was his attention called to any printed matter on the exhibit other than the advertisement. As the quoted testimony finds

no other pretense of corroboration in the record, I am unable to accept it as proof that appellee had used the mark, as a trademark, at any time prior to February 29, 1932, which is the date of first use properly awarded by the examiner to appellant.

"The remaining question is whether the advertisement of itself proves use of the mark as of the date of publication, and in resolving that question I shall assume that the examiner's method of fixing the date was permissible. The mark occurs twice in the advertisement as follows:

" 'Superlatively fine Fashion Park & "Custom Imperial" suits & overcoats are included in this great Baker Clearance.

\* \* \* \* \* \*

" 'This greatest of all clearances offers the finest selections \* \* \* Fashion Park and Custom Imperial tailored suits and overcoats at clearance prices.'

"Appellee's name and the location of its place of business are printed at the bottom.

"It thus appears that appellee was dealing in 'Custom Imperial' suits and overcoats, just as it was dealing in 'Fashion Park' suits and overcoats; but it does not necessarily follow that either brand was its own. And even if it did so follow, use in advertising is not trade-mark use; and it was trade-mark use that appellee was required to prove in order to prevail in this proceeding. Use of a mark in advertising may enable the user to prevent registration to another of the same mark or a mark confusingly similar thereto, but here appellant's mark is already registered. To affirm the decision of the examiner of interferences would be tantamount to a ruling that appellant's registration is invalid and should be canceled. Hence, trademark use by appellee prior to trade-mark use by appellant, of the mark in controversy, is a prerequisite to the registration sought by appellee. Sears, Roebuck & Co. v. Old Colony Shoe Co., 82 F.2d 709, 23 C.C.P.A., Patents, 1039. It is my opinion that such use has not been established."

We think the commissioner arrived at the right conclusion for the right reasons, and the decision appealed from is affirmed.

Affirmed.

HATFIELD, Associate Judge, did not participate in the consideration or decision of this case.