38 C.C.P.A. (Patents)

## McCANE v. MIMS.

### Patent Appeals No. 5750.

United States Court of Customs and Patent Appeals.

Feb. 6, 1951.

164

Ernest P. Rogers and Smith, Kilpatrick, Cody, Rogers & McClatchey, all of Atlanta, Ga., for appellant.

Henry L. Jennings and Jennings & Carter, all of Birmingham, Ala., for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Commissioner of Patents, speaking through the Assistant Commissioner, 80 U.S.P.Q. 104, affirming the decision of the Examiner of Interferences in a trade-mark interference proceeding, which originated in the United States Patent Office.

The interference was declared October 28, 1946, between the registration "Lucky-Seven," Trade-Mark 389,456, in the name of "T. A. McCane, doing business as Queen Ann Company, Atlanta, Georgia," certificate of which issued August 5, 1941, on an application, serial No. 441,516, filed March 13, 1941, and an application, serial No. 483,025, filed May 5, 1945, by appellee Mims, "doing business as Astoria Products Company," of Birmingham, Alabama, for registration of the same mark.

In the registration certificate use of "Lucky-Seven" as a trade-mark for "Hair Dressing or Pomade, Talcum Powder, Skin Bleach, Body Deodorant, Face Powder, Vanishing Cream, and Perfume" since March 1, 1932, was stated. The application of Mims alleged continuous use of the words "Lucky Seven" (not hyphenated) as a trade-mark for "Sachet [Powder], Toilet Water, Deodorant, Pressing Oil, Talcum [Powder], Perfume, and Hair Dressing" since January 1930. As hereinafter related, Mims purchased a business from McCane in February 1932, and he seems to have claimed the date on which he understood McCane began use of the mark.

Both the registration and the application were under the Trade-Mark Act of 1905, and the Lanham Act of 1946, 15 U.S.C.A. § 1051 et seq., is not here involved.

It is established by the record that during some two or three years prior to 1932 the party McCane was egaged, at Birmingham, Alabama, in the manufacture and sale

of cosmetics such as those defined in the registered mark and in the application here involved, including perfume and hair dressing, which were sold in receptacles having thereon labels bearing the notation "Lucky Seven," which notation, however, was not registered then in the United States Patent Office as a trade-mark. The party McCane carried on his business with respect to all his cosmetic products under the name "Astoria Company," which itself was not registered as a trade-mark, and he appears to have used other unregistered notations, such as "Yellow Jasmin," "White Rose," etc. upon some of the perfumes and other products manufactured and sold by him.

It does not appear that McCane had any registered trade-marks while doing business in Birmingham.

As stated in the brief before us on behalf of the party McCane: " * * * While sales were made by mail and otherwise in commerce, a substantial portion of the business consisted of the sale of these products through 'peddlers,' who purchased small quantities and resold them from house to house in and near Birmingham. For several weeks prior to February, 1932, the party Mims, apparently contemplating purchase of all or a part of the business, spent considerable time at the place of business and became familiar with its operation."

It is claimed by the party Mims that in February 1932 he purchased from the party McCane the entire business which McCane was carrying on as the Astoria Company, including all the cosmetic products, formulæ, and other assets, together with the marks and names in use and the good will of the business, and it is conceded on the part of the party McCane that such a sale was made, except it is claimed that McCane expressly reserved *all rights to the perfume and the hair dressing,* the only products to which the notation "Lucky Seven" was being applied, and to the notation itself as a trade-mark in use although not registered.

The primary question for determination, therefore, is one of fact—that is, just what was included in the sale from McCane to Mims, or, to state it differently, does the record show that Mims by the purchase acquired ownership of the mark "Lucky Seven"?

The record upon which that question must be decided is meager and in some respects quite indefinite.

It is asserted on behalf of both parties that the contract of sale made by McCane to Mims was reduced to writing, but neither party was able to produce the written instrument. Mims, testifying on his own behalf, and J. Thornton McCane, testifying on behalf of his brother, the appellant here, gave certain testimony as to the contents of the instrument. This we hereinafter discuss.

It appears that soon after the transaction between Mims and McCane in February 1932 the former changed the name "Astoria Company" to "Astoria Products Company" and carried on the business in Birmingham, continuing use of the unregistered notation "Lucky Seven" on perfume and hair dressings theretofore manufactured by McCane and later applied the notation to other cosmetic products. (The word "Astoria" was first registered to Mims "doing business as Astoria Products Company," December 24, 1946, upon an application filed May 12, 1945. That registration is not involved in the instant controversy. It is noted that it covered numerous drugs in addition to cosmetics, and that it states use "since January 1932.")

It further appears that almost immediately after the sale to Mims (Mrs. McCane, wife of appellant, testified it was during the last week in February 1932) McCane moved to Atlanta, Georgia, and started a cosmetic business there, carrying it on under the name "Queen Ann Company." Except as stated in the certificate of the registration here involved, the record does not disclose just what types of cosmetics the Queen Ann Company manufactured and sold other than hair dressing and perfume marked "Lucky-Seven," which Astoria Company had been making and selling in Birmingham.

An unhappy phase of the case is that appellant McCane was mentally ill during

the trial of this controversy below and was unable to testify.

According to the testimony given by his wife on April 15, 1947, he had been ill since 1936, had not worked for ten years, and had been incapacitated for eight years. When asked during cross-examination as to his condition at the time the application for registration of "Lucky-Seven" was filed on March 13, 1941, she replied: "He was ill at that time, but could take care of some of the things. It was very limited. There was very little at that time going on. He could sign his name."

Mrs. McCane testified that her husband had been adjudged insane, but did not give the date of such judgment. She stated that she was his guardian and had carried on the business after he became incapacitated; that before that time, in fact immediately after establishing the business in Atlanta, advertising began for agents and distributors of the "Lucky-Seven" products, which the Queen Ann Company was making and selling in Atlanta; that she never met Mr. Mims personally; that she never saw the contract of sale between her husband and him; that she had no knowledge prior to this interference proceeding that either Mr. Mims or the Astoria Company was using the notation "Lucky Seven"; and that (she thought in October 1946) she was notified "in a letter received from the Government that he had asked for a copyright of the name 'Lucky Seven'." It is a fair assumption that the letter she referred to related to the interference proceeding here involved, which, as has been stated, was declared October 28, 1946.

Before discussing the evidence further it seems appropriate to quote from the decision of the Assistant Commissioner the following: "The burden of proof of establishing that he acquired the rights of McCane in the mark 'Lucky Seven' rests upon Mims, the junior party, Brewster-Ideal Chocolate Co. v. Dairy Maid Confectionery Co., 62 F.2d 844, 20 C.C.P.A., Patents, 848; B. R. Baker Company v. Lebow Brothers, 150 F.2d 580, 32 C.C.P.A., Patents, 1206. In support of this burden Mims has not only testified as to the transfer of The Astoria Company, which with the exception of the claim as to reservation of rights to the mark 'Lucky Seven' is conceded, but has testified as to the contents of the sales agreement and produced certain pencil notes with respect thereto, an inventory, and certain other exhibits. *His testimony as to the agreement is not only confused, but is considered to be incompetent and the notes and other material referred to are entirely lacking in probative force even if properly identified. Without reviewing this purported evidence, I considered all material introduced by Mims as showing the contents of the written agreement as incompetent and as lacking any probative force as to the contents of this agreement.*" (Italics supplied.)

It will be observed that notwithstanding the obviously correct holding that the burden of establishing acquisition of the rights claimed in the mark "Lucky Seven" rested upon the party Mims as the junior party, the Assistant Commissioner rejected outrightly the entire testimony of Mims relating to the agreement as being "confused" and "incompetent" and also all the material introduced as showing the contents of the contract as "incompetent" and "lacking any probative force," but nevertheless decided the case in Mims' favor.

We find no direct testimony, or other direct evidence, in the record which supports the contention of Mims as to what was in the agreement respecting what was sold to him, except that which the Assistant Commissioner rejected, but the latter held, because of deductions drawn from other matters appearing in the record, that the burden shifted to the party McCane to establish that he reserved from the sale the rights in the mark "Lucky Seven" and that McCane did not meet the burden.

The Examiner of Interferences also was of that opinion. He said: "Upon the meager record presented, the examiner is of the opinion that the senior party [McCane] has failed by far to overcome the presumption that the trade-mark rights to the notation 'Lucky Seven' passed to the junior party upon his acquisition of the business with which it was used and, therefore, the

junior party [Mims] is held to be the owner of the mark here involved."

Immediately following the matter hereinbefore quoted from the decision of the Assistant Commissioner, wherein he rejected the testimony of Mims, the following appears: "The claim of Mims as to acquisition of rights to the mark in question must therefore depend upon the sale of the business of The Astoria Company to him and on that alone. As found by the examiner of interferences, it is well settled in the absence of evidence to the contrary, that the transfer of a business carries with it the right to the use of a trade-mark employed in connection therewith. Macwilliam v. President Suspender Company, 46 App.D.C. 45, 1917 C.D. 179; Jackson Corset Company v. Cohen, 38 App.D.C. 482, 1912 C.D. 534; Snapout Forms Co. v. Allen-Rand Co., Inc., 69 U.S.P.Q. 20, 585 O.G. 651; Lantz Bros. Baking Co. v. Grandma Cake Co., 161 F.2d 739, 34 C.C.P.A., Patents, 1073, 174 U.S.P.Q. 22."

The statement of law made by the Examiner of Interferences and repeated in substance by the Assistant Commissioner relative to the presumption growing out of the transfer of a business is undoubtedly correct, but the right of a purchaser to use a mark which the seller has been applying to goods extends only to the goods and mark he actually purchases—not to any goods or marks not included in the sale—and we know of no law which prevents a seller from reserving from a sale of a business a line or lines of merchandise that he wishes to continue to exploit himself. Such a reservation may be somewhat unusual, but it is entirely legal and, in our opinion, it may not be deduced *conclusively* from a sale *alone* that every line of merchandise which the seller dealt in was included in such sale. We do not understand the tribunals of the Patent Office to have held otherwise in this case, but they greatly emphasized deductions drawn from certain facts which they deemed established. The Assistant Commissioner stated: " * * * Following the transfer of this business Mims was in possession not only of the premises and physical assets, but of all the business and good

will of The Astoria Company, which was carried on just as it had been before. The customers continued to be the same, and the products were sold in the same manner. This included immediate and continuous sale of 'Lucky Seven' products. While the trade name was later changed to Astoria Products Company, and the business moved to a new address, there was no immediate change and no interruption of the business at any time," and held: " * * * Based upon the cases above cited, it seems clear that in the absence of evidence to the contrary, any good will associated with the trade-mark 'Lucky Seven' continued as a part of the business of The Astoria Company, and as such must be considered to have passed to Mims."

The registration to McCane was entered more than four years before the application of Mims was filed, and it is contended on behalf of McCane that in shifting the burden of proof to McCane to establish that he *did* make the reservation claimed rather than leaving it incumbent upon Mims to prove that McCane did *not* make the reservation, the tribunals of the Patent Office overlooked or disregarded the seniority of McCane and the effect of the presumption which flows from his registration.

Apparently, there is no question but that there was some sort of written instrument drawn up in connection with the sale to Mims. He testified that there was and that no reservation of any goods was made therein by McCane. On the other hand, J. Thornton McCane, brother of appellant, who himself was in business in Birmingham at the same time his brother was, testified that according to his best recollection at the time of testifying he thought he signed the agreement as a witness. Mims, testifying in rebuttal, stated: "The contract was first made by making notations on a second sheet of Manila paper two or three days before it was signed and he [T. A. McCane] said it was all right with him and I then typed it off, nobody knowing about it except him and me. There was nobody there when we made it and closed it up."

He was then asked, "Were there any other witnesses to that contract?" and answered, "No, sir."

We suppose this may be construed as a denial by Mims of Thornton McCane's testimony that he signed the agreement as a witness, although the use of "other" in the question of counsel tends to confuse the meaning of the answer. As has been stated, all of Mims' testimony and his other evidence bearing upon what the agreement contained was rejected by the Assistant Commissioner.

It will be observed that the rebuttal testimony of Mims goes only to the matter of witnesses *signing* the agreement. Thornton McCane testified that at one time he had a copy of the agreement in his possession, and Mrs. T. A. McCane testified that "the contract and bill of sale" were mailed from Atlanta to Thornton McCane at Birmingham and not returned. It is not stated just when this occurred. Thornton McCane testified, in answer to a question whether he had made any effort to locate the contract, that he had made every effort to obtain it. We see no reason to doubt that he did at some time have a copy in his possession and he had opportunity to know what it contained. We do not find in his testimony a positive statement that the reservation of "Lucky Seven" was expressed *in the agreement*, but we do find the following in his testimony:

"Q. Did you have any conversation with Mr. Mims about it? A. Yes we discussed it, because there was an agreement that my brother was to keep the name, Lucky Seven, and Mr. Mims was not to use it. He was to use the name 'Astoria'. I asked him why he was using it. I thought perhaps he had gotten permission from my brother. He said my brother had broken the contract and that he was at liberty to use the name if he wanted to; that the contract was null and void, due to the fact that my brother had broken it.

"Q. That was his explanation for making use of the name, Lucky Seven? A. Yes."

He stated that the discussion took place a short while before a suit, which we hereinafter discuss, came up, and we find no denial of the quoted testimony *in the rebuttal testimony of Mims.*

With respect to the testimony of Thornton McCane, the Assistant Commissioner says:

"In support of the claim of reservation of rights of 'Lucky Seven' on the part of McCane, testimony of McCane's brother, Mr. J. Thornton McCane, and of the wife of the party McCane have been submitted, the party McCane, himself, having been declared incompetent. Mrs. McCane makes no claim that she ever saw the agreement referred to, or had any personal knowledge of its contents. The brother stated that he saw and witnessed the contract and recalls the reservation. He also refers to one Wood and states that he also witnessed the contract. Wood was not called to testify by either party and his whereabouts were apparently unknown. He also produced a letter which purports to have been written to McCane by Wood not long after the sale of the business, but which is not properly identified, and cannot, in any event, be proof of the statements made therein. Without detailing the testimony of Mr. J. Thornton McCane, it seems sufficient to state that he claims no knowledge of the negotiations leading up to the sale, and that, while he testified that specific reservation was contained in the written contract, by his own admission he had little knowledge of the actual transaction. His testimony is based to considerable extent on hearsay, and is not sufficient to carry conviction that his unaided recollection of the contents of a particular portion of a written document after a lapse of fifteen years is accurate.

Neither the Examiner of Interferences nor the Assistant Commissioner made mention of a suit for damages brought by Mims against McCane in the Court of Common Claims of Jefferson County, Alabama, in which county the city of Birmingham is located, about four months after the transaction in February 1932, specifically on June 29, 1932. The record contains a certified copy of the summons, the complaint, the demurrer filed on behalf of McCane, and the judgment rendered against him (McCane). The several papers appear

to have been introduced as Mims' exhibits. They appear to us to have a certain relevancy to the instant controversy.

The complaint alleged damage on various grounds, the particular allegation regarded as having some relevancy here being that defendant (McCane) "has *wholly* failed to turn over the formulae that he contracted to turn over to the plaintiff (Mims)." (Italics supplied.)

The complaint did not identify any particular formula or formulae as not having been turned over, and in the present interference proceeding Mims testified, in substance, that *all formulae* were turned over to him.

McCane filed a demurrer to the suit brought against him in Alabama which was overruled and the following judgment was rendered: "8/16/32 Defts. demurrers overruled. Defendant failing to plead further, judgment Nil Dicit is rendered in favor of Pltff. and against Defendant with leave to prove damages and on proof duly made. [,?] It is considered by the court that plaintiff have and recover of the Defendant the sum of Two Hundred and Fifty and No/100 Dollars and costs for which let execution issue." [1]

As has been stated, several grounds of damage were alleged in the complaint, and there is nothing to indicate that the Lucky-Seven formulae and mark received any special notice in the Alabama court.

In that court *all* the formulae were alleged in Mims' complaint *not* to have been turned over; in this proceeding where Mims seeks to establish his right to "Lucky Seven" along with every other mark concededly conveyed to him he testifies that *all* formulae were turned over to him.

This is an inconsistency which obviously places Mims in an unfavorable situation.

Counsel for Mims suggests that the complaint filed in the Alabama court was prepared by his attorney, who, he says, had the contract before him, and was not signed or acknowledged by Mims and so does not constitute testimony by Mims. We do not think this is a sound reason for disregarding the inconsistency. Mims must have furnished his attorney with the statement of facts which he desired to allege. He testified that he did do that and, as we understand the record, that he furnished written memoranda stating what he remembered the contract contained, no copy of the contract itself being available for use by his attorney.

It is stressed on behalf of Mims that some of the Lucky Seven products were left at the place of business by McCane and that the first few sales made by Mims after he took over the business were marked as Lucky Seven products, and that some Lucky Seven labels were left with Mims. This does not strike us as being inconsistent with a retention of ownership of the mark itself by McCane, provided, of course, there was a contract for such retention. In addition to the mark "Lucky Seven" the labels on the packages and unattached labels carried the notation "Astoria" or "Astoria Company" and "Birmingham, Alabama." Since McCane evidently was preparing to go at once to Atlanta, Georgia, he would have had no use for labels bearing the Birmingham address, nor does it seem to have been his intention to use "Astoria" or "Astoria Company." It is not shown that he ever used either in his Atlanta business.

Appellee himself changed the name "Astoria Company" to "Astoria Products Company" and in 1946, without opposition so far as the record shows, obtained reg-

---

[1]. It is obvious from the record that the business involved in the transaction was small. Mims only paid $600 for it—$400 in cash and $200 represented by ten promissory notes of $20 each, which seemingly were to be surrendered after a week or ten days for $150 in cash. It also seems a fair assumption from the record that the ultimate consumers of the cosmetics were principally persons of the colored race who bought them from "peddlers" or "distributors" who purchased them from the manufacturer for resale. Referring to "Pressing Oil" Mr. Mims, who said he used "Lucky Seven" on it, testified: "It has the usual petrolatum base and has wax in it and the negroes put it on their hair and put salve —use a lot of salve, and put it on their hair, and the wax more or less penetrates their hair and it was straight. A hair straightener in other words."

istration of "Astoria" as a trade-mark for a variety of products.

It is true, as argued in substance by counsel for Mims, that registration is not conclusive evidence of a registrant's ownership and right to register, but a presumption of validity does apply to a registration which must be overcome by the party who challenges it.

We agree with the finding of the Assistant Commissioner hereinbefore quoted that the testimony of Mims is confused and that it and the documentary matter introduced by him have not the competency and probative value necessary to support his claim as to what the written agreement of sale contained, and, when that evidence is eliminated, it does not seem to us that the other evidence is sufficient to overcome the presumption attaching to McCane"s registration and other matters embodied in the record.

It does not seem to us that the record established a *prima facie* case for Mims sufficient to shift the burden of proof to McCane, but even if we should be mistaken as to this, we find no reason to refuse weight to the positive and undenied testimony of Thornton McCane that the reservation made on behalf of his brother was in fact made.

For the reasons stated we feel constrained to reverse the decision of the Assistant Commissioner of Patents and it is so ordered.

Reversed.