42 C.C.P.A.(Patents)

NETTIE ROSENSTEIN, Inc.,
Appellant-Applicant,

v.

PRINCESS PAT, Ltd., Appellee-
Opposer.

Patent Appeal No. 6078.

United States Court of Customs
and Patent Appeals.

March 22, 1955.

Mock & Blum, New York City (Asher Blum, New York City, and Charles R. Allen, Jr., Washington, D. C., of counsel), for appellant.

James R. McKnight, Chicago, Ill., for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY and COLE, Judges.

GARRETT, Chief Judge.

This is an appeal, in a trade-mark opposition proceeding, from the decision of the Examiner-in-Chief, 98 U.S. P.Q. 29, acting for the Commissioner of Patents, affirming the decision of the Examiner of (Trade-Mark) Interferences sustaining appellee's opposition and adjudging appellant, a corporation of the State of New York, not entitled to register the term "Odalisque" as a trade-mark for perfume and cologne under the 1946 Trade-Mark Registration Act, 15 U.S.C.A. § 1051 et seq.

Hereinafter the appellant corporation is usually referred to as the applicant and the appellee corporation is usually referred to as the opposer.

While opposer claimed use and ownership of the mark, no application had been made by it for its registration at the time of taking the testimony in its behalf.

Applicant's application for registration, Serial No. 575929, under the Act of 1946 was filed March 23, 1949. It was stated therein:

"The trade mark was first used on January 2, 1946, and first used in commerce among the several states which may lawfully be regulated by Congress on January 2, 1946. * * *"

In the application it was also stated:

"Applicant is the owner of trade mark No. 425,142."

Registration 425,142 was made under the Act of 1905 and is not involved in this opposition proceeding which is under the Act of July 5, 1946. It seems to have been cited by counsel for applicant merely as having some bearing upon alleged laches and acquiescence on the part of opposer, "amounting to an estoppel" of the right to oppose, a matter hereinafter discussed.

In its Notice of Opposition, opposer alleged use of the notation "Secret of the Odalisque" as a trade-mark for perfume "long prior to January 2, 1946, the date of first use [of "Odalisque"] alleged by the applicant," but did not name any specific date of beginning its use in the notice.

The decision of the Examiner of Interferences is detailed and explicit upon every point raised on behalf of the respective parties, and that of the Examiner-in-Chief, while less elaborate, is in harmony with that of the Examiner of Interferences on all questions here material.

In defining the issue the Examiner-in-Chief said:

"* * * Both parties have filed testimony and briefs and were represented at the hearing.

"The opposition is predicated upon the allegation of prior use by the opposer of the mark 'Secret of the Odalisque' for perfume, and the statutory basis for the opposition is that clause of section 2(d) of the Act of 1946 which relates to confusion or mistake or deception of purchasers.

"Applicant admits that the goods of the parties are substantially identical and that the marks are confusingly similar, so that the only question to be decided on appeal is whether or not the examiner's holding that the opposer has proven priority is correct."

In applicant's answer to the notice of opposition, it is admitted that the goods of the respective parties are (1) identical, and (2) of the same descriptive properties; also, it is admitted that the marks are confusingly similar, and the brief for applicant states:

"This leaves for principal consideration the question as to whether or not the holding of the Examiner-in-Chief that appellee has proven priority is correct. * * Although other issues will also hereinafter be discussed, the principal argument of this appeal concerns itself with the issue of priority. Appellant accordingly propounds the issues herein as follows:

"1) Has appellee sustained the burden of proof as to priority?

"2) Does the mark Odalisque indicate origin in appellee or appellant?

"3) Is appellee guilty of laches and acquiescence amounting to an estoppel?"

The answer to the second of the foregoing questions is dependent, of course, upon the answer to the first and, in considering the first, the matter suggested in the third merits notice.

It is proper to say that the substance of all three questions was before both tribunals of the Patent Office (although probably not stated there in the same form as here) and were fully discussed and passed upon by those tribunals.

Before taking up those questions seriatim, it is proper to state that the only oral testimony introduced on behalf of opposer was that of Patricia F. B. Gordon, who seems to have become known in the perfume industry as "Princess Pat," and who was the president of opposer. In connection with her testimony, certain documentary and physical exhibits, claimed to be corroborative of her statements as a witness, were introduced in evidence.

With the exception of Exhibits 1, 2, 3, and 4, none of the documentary exhibits bear dates. Those four are said to be "Radio commercial announcements broadcast for Princess Pat, Ltd.," and the witness testified that they were broadcast, respectively, one on February 2, 1945; two in April, 1945; and one in December, 1945. They made reference to "Secret of the Odalisque" perfume. The witness testified that commercial announcements were broadcast over many radio stations throughout the United States, but no dates were given except those named on Exhibits 1, 2, 3, and 4. She stated that she prepared the announcements and made many of the broadcasts herself. Other broadcasts or announcements she directed.

■ With respect to the first question, *supra*, reading "Has appellee sustained the burden of proof as to priority" we first quote the following from the decision of the Examiner of Interferences:

"The Examiner finds nothing in the record that in any way would discredit the witness, Gordon, and her testimony stands uncontradicted and unimpeached. Corroboration of the testimony of a witness by other witnesses, and the production of records of sales are always helpful, but are not necessary in trade-mark cases. Oral testimony, if clear and convincing, is competent to establish use of a mark. B. R. Baker Co. v. Lebow Brothers, 32 C.C.P.A. [Patents] 1206, 150 F.2d 580, 66

U.S.P.Q. 232; Brewster-Ideal Chocolate Co. v. Dairy Maid Confectionery Co., 20 C.C.P.A. [Patents] 848, 62 F.2d 844, 16 U.S.P.Q. 310; The Snapout Forms Co. v. Allen Rand Co. Inc., 69 U.S.P.Q. 20.

"Likewise, there is no requirement that a party to a proceeding of this character, prove the extent of the use of his mark and certainly he need not show that the purchasers of its goods resold them. As stated in Nims' work on Unfair Competition and Trade-Marks, Fourth Edition, Published by Barker, Vourhis & Co. Inc. New York, Section 218:

" 'No particular extent of use is necessary in the case of a fanciful trade-mark. For this purpose, one bona fide sale of goods bearing the mark is effective, but it must be bona fide. Thereafter, other (others) must avoid the mark, and between rival claimants, "it is the priority of user alone that controls, even though, when the defendant comes into the field, it may not be fully established or may not even be enough established to have become associated largely in the public mind as the plaintiff's make;" (citing authorities),'
the last quotation being from the opinion of Judge Learned Hand in Waldes v. International Manufacturers Agency, 2 Cir., 237 F. 502, 505.

"Opposer, in this case, has proven by a preponderance of the evidence, use of its mark prior to the year 1946, that is prior to the commencement of the use of the mark by Applicant. [,] * * * the exact date of first use by it of its mark during the period of 1940 to 1945, inclusive, is immaterial here."

The Examiner-in-Chief commented as follows:

"Patricia F. B. Gordon, the witness for the opposer, who is also president of the opposer company, testified that the opposer sold perfume bearing the trade-mark 'Secret of the Odalisque' early in 1940. There is, however, nothing in the record which corroborates this alleged date of use. The witness also identified opposer's exhibits 11 and 12, which appear to be made of plastic, as the wartime packages for the solid perfume which were used as early as 1943. The witness also stated that the opposer's exhibits 1, 2, 3 and 4 were radio commercial announcements that were broadcast on many radio stations throughout the United States and that the witness gave some of these broadcasts personally and in other instances directed the broadcasts. These exhibits are dated February 2, 1945, April, 1945 and December, 1945, respectively.

"It is true that oral testimony of a single interested witness must necessarily have his [sic] weakness, nevertheless there is nothing in the trade-mark law which justifies its rejection if it is sufficiently probative. In the instant case the testimony of opposer's witness is not characterized by contradictions or inconsistencies and the testimony with respect to exhibits 1 to 4, inclusive, and 11 to 13, inclusive, is relied upon to show circumstances which are corroborative of the witness' oral testimony. I agree with the examiner that while the earliest date of use claimed by the opposer as 1940 has not been proven, the record does establish that opposer did use its mark on its goods prior to the first use alleged by applicant."

We turn at this point to the evidence introduced on behalf of the applicant. Two witnesses were called and examined by its counsel.

The first of these was Charles E. Gumprecht, the vice-president and general manager of the applicant company which, he stated, was incorporated under the laws of the State of New York in May, 1946.

This witness was asked by counsel for applicant during his direct examination: "Can you tell us when Nettie Rosenstein, Inc. first commenced to use this trade-mark?" to which he answered:

"* * * In 1946, in January, application was made for the use of this name, through Mock & Blum, to the Trade-Mark Office in Washington, and the trade-mark came through, I believe, in November * * * [o]f 1946."

The following then appears in the record:

"Mr. Friedman [counsel for appellant]: I offer in evidence as Applicant's Exhibit No. 1 an ordinary copy of U. S. Registration No. 425,142, issued November 5, 1946 to Nettie Rosenstein, Inc., the applicant herein, for the trade-mark 'Odalisque.'

"(U. S. Registration No. 425,142 for trade-mark 'Odalisque' above referred to was received in evidence and marked Applicant's Exhibit 1, this date.)"

We have examined the testimony carefully and the foregoing is the only date found anywhere claiming first use of the "Odalisque" mark by or on behalf of appellant.

Upon the question of priority, independent of any consideration of the allegation of laches and acquiescence on the part of opposer, which is hereinafter separately discussed, the brief before us on behalf of applicant alleges that opposer's failure to prove certain matters should be held fatal to its right to prevail. We here reproduce these allegations and comment upon them:

"1. Appellee failed to explain in its record as to why the second witness mentioned in its notice of taking testimony dated June 1, 1951 did not testify;"

■ The notice of taking testimony, so referred to, included the name of Mr. M. Martin Gordon, the husband of the witness, Patricia Gordon, the president of opposer who did testify. It is true that he did not testify and that no explanation as to why he did not testify was made or offered, but there was no requirement of law that he should do so or that his failure should be explained.

"2. The single witness did not state that corroborating testimony was not available, although she stated on cross examination that the number of employees opposer had varied from 350 to 12 * * *. It would have been a relatively simple thing under such circumstances for appellee to have produced at least one corroborating witness or at least explained why it could not;"

■■ Since there is no requirement of law that corroboration of the testimony of a witness in a trade-mark opposition case is essential to its probativeness—a matter conceded in applicant's brief and amply supported by authorities cited by the Examiner of Interferences in the excerpt from his decision hereinbefore quoted—we are of opinion that appellant's argument on allegation No. 2 is without any legal force.

"3. Appellee did not furnish the name and address of the printer who printed its Secret of the Odalisque labels and the undated printed exhibits;"

■ The labels referred to were introduced in evidence. Counsel for applicant made no inquiry in his cross-examination about the name and address of the printer, as he might well have done if he regarded them of importance. We are not impressed that they are of the slightest importance so far as the issue in this case is concerned. We hereinafter quote other testimony concerning the labels.

"4. When queried by her counsel as to whether appellee had any invoices on the sales of Secret of the Odalisque perfume prior to 1946, appellee's witness replied:

"'We do not keep invoices that long—we just do not keep it longer than five years, at the most * *.' Despite this, appellee did not pro-

duce a single invoice for 1946, although it is to be reasonably assumed from the foregoing that 1946 invoices were available (the witness having testified on June 22, 1951); * * *"

With respect to this point, it doubtless would have strengthened opposer's case had it produced invoices of sales that would have established sales prior to applicant's first date of use, January 2, 1946, alleged in its application, but the fact that opposer's president and only witness was not able to produce such an invoice does not, in our opinion, justify any doubt of her truthfulness. Her full testimony upon this particular point, given during her direct examination, reads as follows:

"Q. 43. Do you have any invoices of sales of Secret of the Odalisque perfume prior to 1946? A. We do not keep invoices that long. We would have to have another warehouse for that.

"Q. 44. Why do you destroy them? A. Not enough space for storage, also it is a fire hazard. We just do not keep it longer than five years, at the most.

"Q. 45. Is Princess Pat, Ltd., selling Secret of the Odalisque perfume today? A. Oh, yes.

"Q. 46. And has Princess Pat, Ltd., continuously sold Secret of the Odalisque perfume since the time of your adoption in 1940 up to and including the present time?

"Mr. Mock: I am going to object to the question as leading. A. Yes."

While, as hereinbefore stated, the witness was not questioned during cross-examination about the names and addresses of the printers of the labels, the following testimony was given concerning them:

"XQ. 68. Have you any record as to when you first ordered *printed labels* for showing the words Secret of the Odalisque? A. No doubt there are records.

"XQ. 69. May I ask you to produce same? A. It would require quite a search. It is way back. I do not know whether we could. We had a fire at the corner building and everything was destroyed. It was burned down to the ground. The chances are I could not produce those early *invoices*." (Italics supplied by us.)

There seems to have been some confusion here between *labels* and *invoices*, but that does not appear to us of consequence. The fact that it is a common business practice to destroy invoices within a reasonable time after they have served their purpose is, we think, a matter of which judicial notice may be taken.

In the decision of the Examiner-in-Chief it is said:

"* * * Applicant states that *only a single invoice* showing the sale and shipment of the 'Secret of the Odalisque' solid perfume by opposer was offered in evidence, * * *." (Italics supplied by us.)

In the brief before us it is alleged:

"1. *Not a single* invoice showing the sale and shipment of Secret of the Odalisque solid perfume by appellee was offered in evidence;" (Italics supplied by us.)

Of course, we have considered this question upon the basis of the representation made before us, and we deem it not improper to say that the reasons of appeal to us are not very clearly stated. However, as we view this matter, it is really not material whether "only one invoice" or "not a single invoice" was offered in evidence.

"5. Appellee not having supplied the name of a single customer who allegedly sold Secret of the Odalisque perfume since 1940, appellant was not in a position to challenge the oral uncorroborated testimony of appellee's President."

The novel feature—at least novel to us—in point 5 is the implication that it was incumbent upon opposer to supply

the names of customers of those dealers to whom opposer sold. Otherwise, it is said that applicant here was not in a position to challenge opposer's oral testimony.

▮ The Examiner of Interferences took note of this contention and passed upon it. Speaking of a party to a proceeding such as that here involved, he said: "Certainly he [said party] need not show that the purchasers of its goods resold them."

In the course of her testimony upon direct examination opposer's witness, Mrs. Gordon, testified as follows:

"Q. 4. How long have you been in the cosmetic business? A. Approximately forty years.

"Q. 5. What is the business of Princess Pat, Ltd.? A. Manufacturing cosmetics.

"Q. 6. Does Princess Pat, Ltd. have a perfume which is sold under the trademark Secret of the Odalisque? A. Yes.

"Q. 7. Will you give us the names of some of the more important customers of Princess Pat, Ltd.? A. I would say Marshall Field, Mandel Brothers, Carson Pirie Scott & Company, Bloomingdale, Macey's, May Company, Walgreen, Whelan, Stineway Drug Company, Broadway Department Store, practically every worthwhile store in the United States and Canada, Simpson's Eaton's, Sanborn's in Mexico, and all over the world, practically."

It seems to us that the foregoing furnished applicant sufficient data to enable it to make whatever investigation it wished to make as a basis for challenging the testimony of appellee's president.

The third and last of the three questions quoted, *supra,* as propounded by applicant, reads:

"Is appellee guilty of laches and acquiescence amounting to an estoppel?"

We take it to be submitted as a question ancillary to the fundamental question of priority. In connection with it, the testimony of Herbert Rubin, the second and last of the two witnesses called by applicant, was introduced.

It appears that from 1934 to 1936, Rubin was employed as a "buyer of toiletries and cosmetics at Gimbel Brothers, New York," and that in 1936 he resigned from that position to go into business for himself. He "started a company called Rubicon," which was incorporated under the laws of the State of New York. He identified a label bearing the notation "Rubicon Odalisque" as being of the kind used by Rubicon, Inc., from the time it began business in 1936 "until about 1941 or 1942" when, he said, it discontinued "the manufacture of all perfume items in small bottles * * * because of the impossibility of obtaining small bottles at that time due to the war."

From a paper dated February 7, 1947, introduced in evidence as Applicant's Exhibit No. 7 during the taking of Rubin's testimony, it appears that on November 2, 1946, Rubicon Inc. (of which Rubin was President), filed an application, serial No. 511,962 for the registration in the Patent Office of "Odalisque" as a trade-mark for perfume. It also appears from that exhibit that by it, Rubicon, Inc. undertook to convey its application to the applicant Nettie Rosenstein, Inc.

Evidently the application of Rubicon, Inc. so made was for registration under the trade-mark registration act of February, 1905. The Act of 1946 was approved by the President July 5, 1946. By section 46(a) it was provided that the Act should "take effect one year from its enactment".

It further appears from the testimony of Rubin that in the latter part of 1945 or early in 1946, Rubicon, Inc. first learned of the use of the trade-mark "Odalisque" by Nettie Rosenstein, Inc., and that Rubicon, Inc. contacted Nettie Rosenstein in regard to the matter. This led to negotiations which ended in the

applicant Nettie Rosenstein, Inc. paying Rubicon, Inc., according to the witness Rubin's testimony, "around three thousand dollars" and he then executed the papers dated February 7, 1947, filed as Applicant's Exhibits 6–A, 6–B and 6–C.

It is not deemed necessary to set out here all the testimony bearing upon that transaction, but the following testimony of Mr. Gumprecht, President of applicant, given during his cross-examination is quite interesting and we quote it:

"XQ. 59. Referring now to Applicant's Exhibit 7, the Rubicon Odalisque label, has Nettie Rosenstein, Inc. ever sold any of its perfume under that label? A. Under that name.

"XQ. 60. But not under that label, like Exhibit 7? A. No.

"XQ. 61. Did you receive any stock of those labels from Rubicon at the time you received the documents, Exhibits 6–A, 6–B and 6–C? A. No.

"XQ. 62. Did you receive any formula for the Rubicon Odalisque perfume? A. No.

"XQ. 63. Do you know what the formula was for the Rubicon Odalisque perfume? A. No.

"XQ. 64. Did Nettie Rosenstein, Inc. create its own formula for its Odalisque perfume? A. No.

"XQ. 65. From what source did you obtain your formula or your perfume? A. From Van Amering Haebler Co.

"XQ. 66. And you obtained the perfume from that company? A. That is correct.

"XQ. 67. And you obtained the perfume from them ever since you started using the name 'Odalisque'? A. Yes, sir.

"XQ. 68. And it has been the same formula? A. Yes.

"XQ. 69. You didn't change the formula after you bought out the rights of Rubicon? A. No.

"XQ. 70. Did you ever obtain from Rubicon a list of the customers who had bought their Odalisque perfume? A. Never obtained a list. We just listened to them mention in conferences certain firms that they sold it to.

"XQ. 71. Were those conferences prior to the consummation of the deal between your company and theirs? A. Yes.

"XQ. 72. Weren't those companies named for the purpose of showing that sales had been made by Rubicon? A. Yes.

"XQ. 73. Did you receive any stock of the Rubicon Odalisque perfume from them at the time of the transaction with that company? A. No. I was only interested in the name.

"XQ. 74. You didn't receive any merchandise at all? A. No, sir.

"XQ. 75. Not even a single bottle? A. No.

"XQ. 76. You didn't receive any empty bottles, either? A. No.

"XQ. 77. You didn't receive any essences, oils, or ingredients for perfume? A. No.

"XQ. 78. Prior to the execution of the papers, Exhibits 6–A, 6–B and 6–C, Rubicon, Inc. had filed in the Patent Office an application for registration of the trade-mark 'Odalisque' for perfume; is that correct? A. I don't know that they had filed. All I know is that I had filed and received a registration. [It is supposed this referred to serial No. 425,142, hereinafter alluded to].

"XQ. 79. I show you the document, Exhibit 6–C, which states in the first paragraph, 'Whereas Rubicon, Inc., a corporation organized and existing under the laws of the State of New York, at 601 West 26 Street, New York, New York, is the owner of the trade-mark "Odalisque", and of the application for registration in the United States

Patent Office, serial No. 511,962 dated November 2, 1946,' and ask if that refreshes your memory on that subject? A. Yes, it does. I know that they said that they applied.

"XQ. 80. Then in this document Exhibit 6–C, they assigned the application to you; is that correct? A. Yes, that is correct.

"XQ. 81. What happened to that application after it was assigned to Nettie Rosenstein, Inc.? A. I don't know.

"XQ. 82. Do you handle the trade-mark matters for your company? A. Well, Mock & Blum did.

"XQ. 83. Was the prosecution of that application turned over to your attorneys, Mock & Blum? A. No.

"Mr. Friedman [counsel for applicant]: In order to apprise counsel for opposer as to what finally happened to the application about which this witness is now being interrogated, the following statement is made: From an investigation conducted by me, I have ascertained that the application in question was filed by Murray & Parker, attorneys of New York City, and that the said application, after examination, was rejected on the Nettie Rosenstein, Inc. Odalisque registration No. 425,142. The said rejection was never responded to and the application was allowed to lapse. Messrs. Mock & Blum, the present attorneys for applicant, received no power of attorney to prosecute the said application.

\*    \*    \*    \*    \*

"XQ. 90. When did you first hear about the claimed rights of Princess Pat, Ltd.? A. Sometime recently; I don't remember just when.

"XQ. 91. You didn't hear about them in 1946 or 1947? A. I don't remember hearing about it that far back.

"XQ. 92. Were you handling the trade-mark matters of your company at that time? A. Yes.

"XQ. 93. Were you working with the firm of Mock & Blum? A. Yes.

"XQ. 94. I show you what purports to be a carbon copy of a letter dated December 5, 1946, and addressed to Nettie Rosenstein, 36 West 47 Street, New York, and ask you if you have ever seen this letter or if it refreshes your memory on the matter? A. I don't remember the letter, but I have no doubt that it was received, and if it was, at that time it would have been turned over to the attorneys.

"Mr. Friedman [Counsel for applicant]: Counsel for applicant admits receipt of the letter handed to the witness, dated December 5, 1946.

"Mr. Comstock [Counsel for appellee]: If it is all right with you, Mr. Friedman, I would like to state for the record that this is a letter written by our firm, on behalf of our client, Princess Pat, Ltd., notifying Nettie Rosenstein that our client claimed use of the trade-mark 'Secret of the Odalisque' on dry perfume since 1940 and requested that Nettie Rosenstein cease using the trade-mark. I would prefer to do that instead of placing the actual letter in evidence. Is that satisfactory?

"Mr. Friedman: All right."

Rubin's testimony has been carefully studied and practically nothing is found in it which is of much aid in deciding the case. He stated that he "never actually owned a specific formula;" that he "bought a product that was already made up by a perfume supply house." He added:

"\*   \*   \* As a matter of fact, we have never concocted any of our perfumes; we have always bought perfumes made up by chemical supply houses."

With respect to the registration for which, he stated, Rubicon, Inc. applied (Serial No. 511,962) he gave the following testimony:

"XQ. 66. Do you know what happened to your company's application for trade-mark registration after you made the assignment, Exhibit 6–C? A. No, I don't.

"XQ. 67. You don't know whether that ever resulted in a registration or what happened to it? A. No, I don't know.

"XQ. 68. Was its prosecution taken over by the attorneys for Nettie Rosenstein? A. I don't know whether they prosecuted it under our name. I doubt that very much.

"XQ. 69. Did you ever make an abandonment of the application? A. I don't know. I would have to consult the patent attorney who handled the matter at that time.

"XQ. 70. Who was that? A. Murray & Parker.

"XQ. 71. Of New York? A. Yes. The firm now goes under the name of Parker & Graham.

"XQ. 72. So that your company claimed to be the owner of the trademark 'Odalisque' continuously from 1936, when you adopted it, up until February 7 of 1946, when you executed these assignment documents, Exhibits 6–A, 6–B and 6–C; is that right? A. Yes.

"XQ. 73. And you claimed to be the owner of the trade-mark and of all rights in it all during the year 1946; is that correct? A. That is correct."

It is perfectly clear that Rubin did not sell applicant its *business or any interest therein.* The following statement from opposer's brief is accurate according to the record (References to pages of the record are deleted as indicated by asterisks):

"Applicant's witnesses admitted that there was no going business which was transferred or which could have been transferred to applicant at the time of the alleged assignment * * *. The alleged assignor had not sold any perfume for five years prior to the assignment * * *. There was no transfer of merchandise, materials, inventory, labels *or anything of* a material nature * * *. Nothing was transferred in addition to the piece of paper purporting to be an assignment * * *."

█ The Examiner-in-Chief, therefore, correctly stated the law in that part of his decision reading:

"It is clear from the testimony of the witness Rubin that at the time the assignment was executed Rubicon, Inc. was not engaged in the perfume business and had not been so engaged since 1941 or 1942. The nonuse of the mark by Rubicon, Inc., during the war period may not have constituted an abandonment of the mark, nevertheless *a mark may not be legally transferred to another unless accompanied by the transfer of some business with which the mark is shown to have been used.* Kelly Liquor Co. v. National Brokerage Co., Inc., 26 C.C.P.A. [Patents] 1110, 102 F.2d 857, 41 U.S.P.Q. 311." (Italics supplied by us.)

█ From the statement made by counsel for opposer, quoted *supra,* which apparently was accepted by counsel for applicant as evidentiary in character, it is clear that opposer objected to the use of the mark by applicant as early as December 5, 1945, and we find nothing in the record which, in our opinion, would justify a finding of laches and acquiescence on the part of opposer amounting to an estoppel of opposer's right to oppose.

The decision of the Examiner-in-Chief sustaining that of the Examiner of Interferences is, therefore, affirmed.

Affirmed.