THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: April 6, 2022                                     Mailed: September 21, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*JNF LLC*
*v.*
*Harwood International Inc.*

————

Cancellation No. 92070634

————

Andrew D. Skale of Mintz Levin Cohn Ferris Glovsky and Popeo PC,
    for JNF LLC.

Andy Nikolopoulos of Fox Rothschild LLP,
    for Harwood International Inc.

————

Before Wellington, Greenbaum, and Heasley,
    Administrative Trademark Judges.

Opinion by Heasley, Administrative Trademark Judge:

This is a priority dispute.

On October 6, 2014, Respondent Harwood International Inc. applied to register the standard character mark HAPPIEST HOUR on the Principal Register for "bar and restaurant services" in International Class 43. Within two years, the application matured into a Registration No. 50008661 on July 26, 2016.[1]

---

[1] Application Serial No. 86415500 was originally based on a declared bona fide intention to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).

Subsequently, on May 1, 2018, Petitioner JNF LLC applied to register the mark THE HAPPIEST HOUR in standard characters on the Principal Register for "restaurant and bar services" in International Class 43.[2] In its application, Petitioner claimed to have first used the mark anywhere and in commerce "at least as early as 10/00/2014." The examining attorney assigned to Petitioner's application issued an office action citing Respondent's HAPPIEST HOUR registration as a bar to registration under Section 2(d) of the Trademark Act.[3] Petitioner then amended its claimed date of first use anywhere and in commerce to September 7, 2014.[4]

On February 19, 2019, Petitioner filed a Petition to cancel Respondent's registration.[5] The next day, it requested suspension of its pending application pending disposition of the cancellation, which request was granted.[6] Petitioner seeks cancellation of Respondent's HAPPIEST HOUR registration under Trademark Act Section 2(d), 15 U.S.C. § 1052(d), on the basis of likelihood of confusion.[7]

---

[2] Application Ser. No. 87901527.

[3] Aug. 23, 2018 Office Action, Respondent's second Notice of Reliance (NOR), ex. M, 34 TTABVUE 160-64.

Citations to the record or briefs in this opinion include citations to the publicly available documents on TTABVUE, the Board's electronic docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the numbers following "TTABVUE" refer to the page numbers of that particular docket entry.

[4] *See* Petitioner's voluntary amendment, Sept. 26, 2018 Response to Office Action. Respondent's second NOR, ex. M, 34 TTABVUE 157-59.

[5] 1 TTABVUE.

[6] *See* Petitioner's Feb. 20, 2019 Response to Office Action requesting suspension and Feb. 27, 2019 Office Action suspending action on Application Ser. No. 87901527. Respondent's second NOR, ex. M, 34 TTABVUE 145-53.

[7] In its brief, Petitioner raises a new ground for cancellation: that Respondent's registration is void ab initio because its registration certificate issued on July 26, 2016, but indicates a date of first use anywhere and in commerce as of October 3, 2016—over two months later. Petitioner's brief, 36 TTABVUE 29. This ground is not meritorious and will not be considered for two reasons. First, Petitioner did not assert it as a claim in its Petition for Cancellation.

In its Answer, Respondent admits that its registered HAPPIEST HOUR mark was cited as confusingly similar to Petitioner's THE HAPPIEST HOUR mark, but denies that Petitioner has established prior rights in the mark THE HAPPIEST HOUR.[8]

The parties fully briefed the case, and appeared for oral argument.

## I.    Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action must be established in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837 at *3 (Fed. Cir. 2020), *cert. denied*, 142 U.S. 82 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26, 109 USPQ2d 2061, 2067 n.4 (2014)). Under Trademark Act Section 14, 15 U.S.C. § 1064, "any person who believes that he is or will be damaged … by the registration of a mark on the principal register" may petition to cancel that registration. A party in the position of plaintiff may petition to cancel registration of a mark when such cancellation is within the zone of interests protected by the statute, 15 U.S.C. § 1064,

---

1 TTABVUE. *See* Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 314 (2022) ("A plaintiff may not rely on an unpleaded claim"). And second, as Respondent notes, its date of first use is October 3, 2015, as stated in its Statement of Use. The later date is a scrivener's error in USPTO data entry, which Respondent moved to correct. Respondent's brief, 37 TTABVUE 22. A Certificate of Correction was processed on July 6, 2022.

8 Answer, ¶¶ 2-7, 4 TTABVUE 3-4. Respondent also asserted five "affirmative defenses" in its Answer. 4 TTABVUE 4-5. The first, "failure to state a cause of action," is not an affirmative defense. *Topco Holdings, Inc. v. Hand 2 Hand Indus., LLC*, 2022 USPQ2d 54, *10-11 (TTAB 2022). The second and fourth, denying that Petitioner has prior rights and claiming that Respondent "is the prior, consistent, and exclusive user of the mark in question," are amplifications of Respondent's denials, and will be treated as such. *Mars Generation, Inc. v. Carson*, 2021 USPQ2d 1057, * 3-4 (TTAB 2021). The third, raising the equitable defenses of laches, estoppel, and acquiescence, was not pursued, and is therefore waived or forfeited. *U.S. Olympic Committee v. Tempting Brands,* 2021 USPQ2d 164, *4 (TTAB 2021). And the fifth, reserving the right to raise additional affirmative defenses, is not itself an affirmative defense. *Made in Nature, LLC v. Pharmavite LLC*, 2022 USPQ2d 557, *6 (TTAB 2022).

and the plaintiff has a reasonable belief in damage that is proximately caused by registration of the mark. *Meenaxi Enter., Inc. v. Coca-Cola Co.*, 2022 USPQ2d 602, at *2 (Fed. Cir. 2022) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. at 132; *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020).

There is no question that Petitioner, whose application has been blocked by Respondent's registration, is entitled to be heard on the question of cancellation of that registration. *Lipton Indus., Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). Further, "[t]o establish a reasonable basis for a belief that one is damaged by the registration sought to be cancelled, a petition may assert a likelihood of confusion which is not wholly without merit…." *Lipton Indus.,* 213 USPQ at 189. Accordingly, Petitioner may seek to cancel Respondent's registration, as its claim is within the zone of interests protected by statute and Petitioner has a reasonable belief in damage proximately caused by the continued registration of Respondent's mark. *Meenaxi v. Coca-Cola,* 2022 USPQ2d 602, at * 2; *Corcamore v. SFM*, 2020 USPQ2d 11277, at *6-7; *Sabhnani v. Mirage Brands, LLC*, 2021 USPQ2d 1241, *13-14 (TTAB 2021).

## II.   The Record

The record consists of the pleadings, the file of Respondent's involved registration, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), and the following submissions by the parties:

### Petitioner

- First Notice of Reliance (NOR) containing Respondent's discovery responses; testimonial declaration of Petitioner's CEO, Jon Neidich; testimonial

declaration of restaurant patron, John Fitzgerald; THE HAPPIEST HOUR press release and correspondence relating thereto; brochure of branding options; article printouts regarding THE HAPPIEST HOUR restaurant and bar, among other establishments; draft menu; employee information; Respondent's press release; printout of THE HAPPIEST HOUR webpage; prosecution file for Application Serial No. 879011527 for THE HAPPIEST HOUR; registration file for Reg. No. 5008661 for HAPPIEST HOUR. (28 TTABVUE.)

- Second NOR containing amended testimonial declaration of Jon Neidich; Jon Neidich deposition transcript; John Fitzgerald deposition transcript. (30 TTABVUE.)

- Third NOR, in rebuttal, containing corrections to errata in Neidich deposition transcript and second declaration of Jon Neidich. (35 TTABVUE.)[9]

**Respondent**

- John Fitzgerald deposition transcript, with declaration attached as exhibit. (31 TTABVUE.)

- Jon Neidich deposition transcript, with exhibits (some of which are duplicated in Respondent's second NOR). (32 TTABVUE.)

- First NOR designating the portions of the Neidich and Fitzgerald depositions on which Respondent intends to rely. (33 TTABVUE.)[10]

---

[9] In its brief, Respondent contends that Petitioner's Third Notice of Reliance is untimely. Respondent asserts that it "agreed to stipulate to any post-deadline Notices of Reliance filed by Petitioner, only to the extent that it was in response to any late discovery production by Registrant (which there was none)," and that "Petitioner's Third Notice of Reliance is untimely because it was not filed in response to any 'late discovery' by the Registrant." Respondent's brief, 37 TTABVUE 19n.3. Petitioner responds that its Third Notice of Reliance (which includes the second declaration of its CEO, Jon Neidich) is filed in response to Respondent's deposition of Mr. Neidich, at which Respondent introduced Google Street View images of Petitioner's restaurant storefront and questioned him about those images in order to cast doubt on his position that his restaurant had exterior signage displaying THE HAPPIEST HOUR in September 2014. Petitioner's reply brief, 40 TTABVUE 13. We find that Petitioner's Third NOR, containing his declaration, is timely and admissible as proper rebuttal evidence. Trademark Rule 2.121(c), 37 C.F.R. § 2.121(c). *See Apollo Med. Extrusion Techs., Inc. v. Med. Extrusion Techs., Inc.*, 123 USPQ2d 1844, 1847 (TTAB 2017) (proper rebuttal testimony). The objection is overruled.

[10] During its trial period, Respondent noticed and took depositions of Petitioner's declarants, John Fitzgerald and Jon Neidich—the latter as Petitioner's Rule 30(b)(6) corporate representative. Rule 30(b)(6) provides a basis only for taking **discovery** depositions of an adverse party; the Trademark Rules of Practice do not provide for noticing or taking a **testimony** deposition of an adverse party under Rule 30(b)(6). *Jain v. Ramparts Inc.*, 49

- Second NOR containing Petitioner's initial disclosures and discovery responses; declaration of Jeri Hunter and copies of email correspondence between the parties; articles about Petitioner's THE HAPPIEST HOUR restaurant opening; Petitioner's Facebook postings; Petitioner's branding brochure; employee pay stubs, and September 22, 2014 draft menu; Google Street View of Petitioner's restaurant site as of June 2019 and October 2014; USPTO records containing the prosecution histories of Petitioner's Application Serial No. 87901527 and Respondent's Registration No. 5008661. (34 TTABVUE.)

## III. Priority and Likelihood of Confusion

### A. Applicable Law

Section 2(d) of the Trademark Act provides a ground for cancellation of a registered mark based on likelihood of confusion with a petitioner's mark or trade name previously used in the United States and not abandoned. *Kemi Organics, LLC v. Gupta,* 126 USPQ2d 1601, 1604 (TTAB 2018).

The parties agree that the central issue is priority.[11] Their restaurant and bar services are identical, and their marks, THE HAPPIEST HOUR and HAPPIEST HOUR, are nearly identical, differing only by the article THE, which has no source-indicating significance in this case. *Pierce-Arrow Soc'y v. Spintek Filtration, Inc.,* 2019 USPQ2d 471774, *5 (TTAB 2019). This peripheral difference would likely go

---

USPQ2d 1429, 1431 (TTAB 1998). Nonetheless, Mr. Neidich's testimony as founder and owner of Petitioner may be properly treated as examination of one of Petitioner's declarants. So too with Respondent's examination of Mr. Fitzgerald (even though his deposition transcript erroneously refers to him as a "corporate representative"). Respondent introduced both witnesses' deposition transcripts in their entirety, with a Notice of Reliance thereon. 31-33 TTABVUE. And Petitioner introduced both deposition transcripts, as well, 30, 35 TTABVUE. Neither party objected to the other's introduction of this evidence. We accordingly consider the contents of both transcripts as having been properly made of record. "When evidence has been made of record by one party in accordance with these rules, it may be referred to by any party for any purpose permitted by the Federal Rules of Evidence." Trademark Rule 2.122, 37 C.F.R. § 2.122; TBMP § 703.01(a).

[11] Petitioner's brief, 36 TTABVUE 11; Respondent's brief, 37 TTABVUE 9.

unnoticed by bar and restaurant patrons, and therefore fail to distinguish the marks, which are otherwise identical.[12] We accordingly focus on Petitioner's proof of priority.

"Because a trademark owner's certificate of registration is 'prima facie evidence of the validity of the registration' and continued use of the registered mark, the burden of proof is placed upon those who seek cancellation. 15 U.S.C. § 1057(b)…." *Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 892 F.2d 1021, 13 USPQ2d 1307, 1309 (Fed. Cir. 1989) *quoted in NT-MDT LLC v. Kozodaeva*, 2021 USPQ2d 433, *13 (TTAB 2021). "For priority purposes, a respondent may rely upon the filing date of the underlying application that matured into its involved registration." *Kemi Organics v. Gupta*, 126 USPQ2d at 1604. Petitioner thus bears the burden of proving that its mark was "previously used in the United States" before Respondent's October 6, 2014 constructive use filing date. *Hydro-Dynamics Inc. v. George Putnam & Co. Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987).

"To establish priority, the petitioner must show proprietary rights in the mark that produce a likelihood of confusion. *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 1320, 209 USPQ 40, 43 (CCPA 1981). These proprietary rights may arise from a prior registration, prior trademark or service mark use, prior use as a trade name, prior use analogous to trademark or service mark use, or any other use

---

[12] Petitioner implies that Respondent adopted its mark in bad faith, filing its application to register HAPPIEST HOUR October 6, 2014, a month after the New York Times published a September 2, 2014 article about a dozen new bars, including Petitioner's THE HAPPIEST HOUR. Petitioner's brief, 36 TTABVUE 13-14. However, an inference of 'bad faith' requires something more than mere knowledge of a prior similar mark. *Quiktrip W., Inc. v. Weigel Stores, Inc.,* 984 F.3d 1031, 2021 USPQ2d 35, *4 (Fed. Cir. 2021). Petitioner did not depose Respondent's principals to verify its suspicion, so its imputation of bad faith is nothing more than speculation, which carries no probative value.

sufficient to establish proprietary rights." *Herbko Int'l Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) *cited in DeVivo v. Ortiz*, 2020 USPQ2d 10153, at *3.

A party in the position of plaintiff must ordinarily prove priority by a preponderance of the evidence. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000); *Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 994 F.2d 1569, 26 USPQ2d 1912, 1918 (Fed. Cir. 1993) ("the challenger's burden of proof in both opposition and cancellation proceedings is a preponderance of the evidence.") *quoted in General Motors Corp. v. Aristide & Co.*, 87 USPQ2d 1179, 1186-87 (TTAB 2008).

But in the circumstances presented in this case, Petitioner's burden of proof is heavier. When Petitioner filed its application to register THE HAPPIEST HOUR based on use in commerce, it alleged first use of the mark anywhere and in commerce "at least as early as 10/00/2014."[13] When a month and year are given without a specified day, the date presumed for purposes of examination is the last day of the month—in this case, October 31, 2014, weeks after Respondent's October 6, 2014 constructive use date. *See* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 903.06 (2022). As noted above, after Respondent's HAPPIEST HOUR registration was cited as a bar to registration, Petitioner amended its alleged date of first use to September 7, 2014 and then commenced this cancellation proceeding, asserting prior

---

[13] App. Ser. No. 87901527, Respondent's second NOR, ex. M, 34 TTABVUE 178-81.

use of its mark based on the amended date.[14]

When a party claims a date earlier than the date it alleged when it filed its application, that is considered a change in position, contrary to the admission it made against interest at the time it filed the application; in these circumstances, its proof of the earlier date must be clear and convincing. *Hydro-Dynamics v. Putnam*, 1 USPQ2d at 1773-74 (heavier burden imposed where applicant seeks to prove date of first use earlier than stated in its application) (citing *Elder Mfg. Co. v. Int'l Shoe Co.*, 194 F.2d 114, 92 USPQ 330, 332 (CCPA 1952) and *Stanspec Co. v. Am. Chain & Cable Co.*, 531 F.2d 563, 567, 189 USPQ 420, 424 (CCPA 1976)).

This enhanced burden of proof can apply to either party in an *inter partes* proceeding, plaintiff or defendant. *See Cont'l Gummi-Werke AG v. Continental Seal Corp.*, 222 USPQ 822, n.4 (TTAB 1984) ("It is true that it has often been held that a party who seeks to show an earlier date of use than that claimed in its application or registration is under a 'heavy burden' in that the proof must be clear and convincing…."). In *Elder Mfg., supra.*, the Court of Customs and Patent Appeals held that the **opposer**

> is not bound by the date of first use alleged in his application for registration No. 168,075. He is entitled to carry the date of first use back to a prior date by proper evidence. However, where one has alleged in his application for a trade-mark a date of earliest use and subsequently by proof attempts to show an earlier date, he is then under a **heavy burden**, and his proof must be **clear and convincing**. (Emphasis added.)

*Elder Mfg. v. Int'l Shoe*, 92 USPQ at 332.

> The above rules should apply with particular force where, as in this case, the date on which the trade-mark application was filed (January 24, 1922)

---

[14] *See* Petitioner's voluntary amendment, Sept. 26, 2018 Response to Office Action. Respondent's second NOR, ex. M, 34 TTABVUE 157-59.

is substantially contemporaneous with the date of first use alleged therein (October 1, 1921) and an attempt is made many years later to establish an earlier date.

*Id*. at 333. *Elder Mfg*. cites an earlier decision, *B. R. Baker Co. v. Lebow Bros.*, 150 F.2d 580, 66 USPQ 232 (CCPA 1945) which imposed the heavier burden on the party in the position of plaintiff: "Where, however, one has under oath stated his earliest use and then amends his oath and by proof attempts to show an earlier date, he is then under a heavy burden, and his proof must be 'clear and convincing.'" *Id*. at 236.[15]

In *Stanspec,* the Court declared "Since the allegation of the date of first use in the application may be considered to have been made against interest at the time of filing of the application, a party may have to bear an especially heavy burden of proof to establish a date of first use prior to that alleged in his trademark application as originally filed." *Stanspec v. Am. Chain & Cable*, 189 USPQ at 424. It cited *Elder Mfg*. for the principle that "in an opposition proceeding, opposer was allowed to carry his date of first use back to a date prior to that alleged in his application. However, proof of the earlier date had to be 'clear and convincing.'" *Id*. at 424n.10.

---

[15] *Baker v. Lebow,* 66 USPQ 232, was a pre-Lanham Act appeal from an interference proceeding. Baker, in the position of plaintiff, originally stated under oath in its application that it had continuously used its involved trademark on its goods (men's suits, top coats, and overcoats) since November 26, 1936. It then amended its application to claim first use in January 5, 1930, two years prior to Lebow's February 29, 1932 date of first use. *Id*. at 234. Lebow, like Respondent here, relied on its filing date and took no proof. Baker's proof consisted of the deposition testimony of a single witness, Frank P. Baker, its Vice President and General Superintendent. His testimony was vague and uncertain. As the Court noted, "Whether or not the testimony of the single witness Baker, indefinite and uncertain as it is, together with the apparent lack of probative force to be given to the exhibits, is sufficient proof of priority in this case does not even present a close question. Here there was no cross-examination. Here the questions were leading. Here the witness was doubtful. Here he depended upon his memory, and the things relied upon to refresh the memory had little pertinency. Other circumstances herein pointed out, we think, suggest that the offered proof does not meet the heavy burden placed upon Baker." *Id*. at 236.

*Hydro-Dynamics* cites *Elder* and *Stanspec* for the proposition that the heavier burden applies. And *Hydro-Dynamics,* in turn, has been cited by later authorities for the proposition that a party in the position of plaintiff, whether a petitioner or counterclaimant, must, in similar circumstances prove an earlier date of first use by clear and convincing evidence. *Martahus v. Video Duplication Svcs. Inc.*, 3 F.3d 417, 27 USPQ2d 1846, 1852 n. 7 (Fed. Cir. 1993) (respondent/counterclaimant); 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:71 (5th ed. June 2022) (petitioner).

Here, Petitioner's original and amended dates of first use are much closer to Respondent's constructive use date—no more than a few weeks before or after October 6, 2014—than the parties' dates in *Elder*. And Petitioner amended its date nearly four years after Respondent's constructive use date and registration date, and only after being confronted with Respondent's registration as a bar to registration of its own mark. So the principles underpinning the heavier burden of proof apply with even greater force.

Petitioner must accordingly prove its amended September 7, 2014 date of first use by clear and convincing evidence. Clear and convincing evidence may consist of declaration testimony, if it is sufficiently probative. "Such testimony should not be characterized by contradictions, inconsistencies, and indefiniteness, but should carry with it conviction of its accuracy and applicability." *Elder Mfg. v. Int'l Shoe,* 92 USPQ at 332; *Baker v. Lebow*, 66 USPQ at 236; *see also Threshold.TV Inc. v. Metronome Enters. Inc.,* 96 USPQ2d 1031, 1036 (TTAB 2010).

### B.    Application of Law to the Evidence

Petitioner relies on two testimonial declarations, one from Petitioner's Chief Executive Officer, Jon Neidich, another from his friend from college, John Fitzgerald.

#### 1.    Neidich Testimony

Jon Neidich states in his amended testimonial declaration that he is Petitioner's CEO (¶2); that on September 7, 2014, Petitioner issued a press release concerning the opening of THE HAPPIEST HOUR restaurant, which was taking reservations then (¶7); that THE HAPPIEST HOUR restaurant and bar received "tremendous press" in August and September 2014 (¶8); that while the "official" grand opening of THE HAPPIEST HOUR was in October 2014, it had an earlier "soft opening," and provided restaurant and bar services starting on September 7, 2014 (¶4); that the restaurant served food and drinks from its menu to members of the public in September 2014 (¶¶5-6); that the restaurant's chef cooked food for the guests in September 2014 (¶11); that Mr. Neidich, the chef and the head bartender served food and beverages to guests in September 2014 (¶12); that "[a]ll guests who came to eat and drink at THE HAPPIEST HOUR restaurant in September 2014, received restaurant services under THE HAPPIEST HOUR brand" (¶14); and that these guests, four of whom were named, included John Fitzgerald (¶15).[16]

To corroborate the testimonial declarations, Petitioner submitted, inter alia, its September 7, 2014 press release, which stated, in pertinent part:

---

[16] Petitioner's second NOR, 30 TTABVUE 5-7.

**FOR IMMEDIATE RELEASE**

**The Happiest Hour, a New Bi-Level Bar by Acme's Jon Neidich and Veteran New York Bartender Jim Kearns, to Open in Greenwich Village in Late September 2014**

**NEW YORK, September 7, 2014**—The Happiest Hour, a new bi-level watering hole by Acme's Jon Neidich and veteran New York bartender Jim Kearns, formerly of Pegu Club, the NoMad Hotel and Mayahuel, is opening in the heart of Greenwich Village in late September 2014. Their vision is to restore a sense of fun and escapism to the cocktail bar experience by returning to the origins of what a cocktail bar once was: a place to enjoy one's self among friends, with spot-on drinks and graceful service. Located at 121 West 10th Street, between Greenwich and Sixth Avenues, it will be open daily from 5 p.m. to 4 a.m. [17]

A September 2, 2014 New York Times article about over a dozen new bars included THE HAPPIEST HOUR:

**The New York Times**    https://nyti.ms/1uu2FzL

# New Bars Offer Barrels, Beer and Boilermakers

**By Robert Simonson**

Sept. 2, 2014

…

**THE HAPPIEST HOUR** This two-story project combines the talents of the restaurateur Jon Neidich (Acme) and the bartender Jim Kearns (Play, NoMad). The casual main floor space will evoke the 1960s and '70s, while the basement will be a '50s-style cocktail lounge. (September): *121 West 10th Street (Greenwich Avenue).* [18]

Similarly, on August 24, 2014, the magazine GRUBSTREET reviewed "The 20 Best Nightlife Picks for Fall", including:

---

[17] Petitioner's first NOR, ex. G, 28 TTABVUE 53, authenticated in the second Neidich testimonial declaration, ¶1, 35 TTABVUE 7.

[18] NYTimes.com, Petitioner's first NOR, ex. F, 28 TTABVUE 48-49.

**The Happiest Hour**

*121 W. 10th St., nr. Greenwich Ave.; no phone yet; mid-Sept.*

Expect the local beautifuls to flood this new one from Acme's Jon Neidich and bartender Jim Kearns (Pegu Club). The main floor draws décor inspiration from the '60s and '70s and will be more raucous than the subdued subterranean cocktail lounge, designed with the '50s in mind—classic drinks, *Mad Men* vibes, a jukebox. [19]

Petitioner adds its September 22, 2014 draft menu listing food and drink items:

**The Happiest Hour Menu**
Draft 09.22.2014

SALADS & SANDWICHES
Kale Salad
Cobb Salad
Chicken Tenders
Grilled Cheese
Chicken Salad
Turkey Club
Hot Brown
Cheeseburger

SIDES
Smoked Fish Dip
Buffalo Cucumbers
Salt & Pepper Broccoli
Grilled Corn
Coleslaw

DESSERT
Banana Split
Brownie A' la mode
Rootbeer Float
Fried Apple Pie

---

[19] Grubstreet.com, Petitioner's first NOR, ex. E, 28 TTABVUE 30, 33.

**DRINKS**

<u>CLASSICS</u>
Old Fashioned
Daiquiri
Sazerac
Gibson
Tom Collins
Manhattan

<u>HOUSE COCKTAILS</u>
Maid to Order
Bitter Lemon
Linky Way
Barks
Far From the Tree
Sugar Shack Sling
Powderkeg [20]

Respondent focused its efforts on discrediting the Neidich testimony at deposition. Mr. Neidich did not fare well under questioning.

Respondent's counsel asked Mr. Neidich about Petitioner's alleged date of first use:

> Q· ·Did -- did The Happiest Hour provide
> restaurant and bar services to the public on September
> 7th, 2014?
> A· ·I don't remember.[21]

At first, he evaded the questioning:

> Q· ·Okay.· Do you understand what it means to
> operate a restaurant?
> A· ·What's your definition of operating a
> restaurant?[22]

> Q· ·And sitting here today, you don't remember
> what actually took place on September the 7th?

---

[20] Petitioner's first NOR, ex. I, 28 TTABVUE 65, authenticated as a business record in the second Neidich testimonial declaration, ¶1, 35 TTABVUE 7. *See* Fitzgerald decl. ¶ 8, Petitioner's first NOR, 28 TTABVUE 24.

[21] Neidich dep. 28:20-23, 32 TTABVUE 29.

[22] Neidich dep. 19:8-11, 32 TTABVUE 20.

A··It was a long time ago.

Q··So sitting here today, is there any way that anyone can provide insight as to what happened on September the 7th?
A··I don't know.[23]

When pressed, he eventually explained that the restaurant was only offering reservations then:

What restaurant and bar services to members of the public did The Happiest Hour provide on September the 7th, 2014?
A·· **On September the 7th, it would have been just taking reservations.**[24]

Q·· **So are you saying on September the 7th, it would have been the offering of reservations as opposed to the actual offering of bar and restaurant services?**
MR. SKALE:··Objection; vague.
[after objections]
A·· **Yes.**[25]

Mr. Neidich testified that the soft opening began a week after September 7th,[26] that it was spread out over five days,[27] that over 200 menus were printed, and that around 200 guests were served that September.[28] They were not charged for the food

---

[23] Neidich dep. 26:14-16, 21-24, 32 TTABVUE 27.

[24] Neidich dep. 31:5-9, 32 TTABVUE 32 (emphasis added).

[25] Neidich dep. 30:4-11, 32 TTABVUE 31.

[26] Neidich dep. 34:3-8, 32 TTABVUE 35.

[27] Neidich dep. 35:6-22, 32 TTABVUE 36.

[28] Neidich dep. 41:9-11, 44:9-12, 32 TTABVUE 42, 45.

and drink, but were expected to tip the staff.[29]

He then was asked about how guests would know the restaurant was open, and testified about THE HAPPIEST HOUR's external signage:

> Q· · Okay.· How -- how did you let members of the
> public know that the restaurant was opened for food
> and drink in September 2014?· Sorry.
> A· · The doors were unlocked.· The lights were on.
> **There was a sign**.[30]
>
> Q· · What did the sign say?
> A· · The Happiest Hour.
> Q· · Say that again?
> A· · The Happiest Hour.[31]
>
> Q· · What about -- was the signage you had in
> September, was it temporary or was it your final
> sign?
> A· · Final.[32]

Asked about the sign, he backpedaled:

> Q· · And you said that the initial signage was
> also the final signage, does that mean that this is
> the way the signage has always appeared?
> A· · I don't remember.
> Q· · **You don't remember how -- what the signage**
> **looked like in September of 2014?**
>  [after objections]
> A· · **No, not exactly.**
> Q· · **(By Mr. Nikolopoulos)· Would it have still at**
> **least had the words The Happiest Hour, if not the**
> **logo?**

---

[29] Neidich dep. 41:2-4, 32 TTABVUE 42.

[30] Neidich dep. 36:5-9, 32 TTABVUE 37 (emphasis added).

[31] Neidich dep. 37:12-14, 32 TTABVUE 38.

[32] Neidich dep. 48:10-13, 32 TTABVUE 49.

**A·· I don't know.**
Q·· Well, you said you had signage, can you describe the signage back in September 2014?
**A·· I can't remember.**[33]

Then he was shown an October 2014 Google Street View image of the restaurant:



[34]

He was asked:

Q·· (By Mr. Nikolopoulos)· I'll represent to you that this is a photograph taken of the outside of your restaurant in October 2014?· Do you see that on the Google Street View?
A·· Yeah.
Q·· You testified earlier that there was signage as early as September 2014, would you agree with me that in October 2014 there's no such signage?
MR. SKALE:· Objection; mischaracterization.

---

[33] Neidich dep. 57:1-16, 32 TTABVUE 58 (emphasis added).

[34] Neidich dep. ex. K, 32 TTABVUE 107.

A· · **Yeah, looking at this image.**[35]
Q· · (By Mr. Nikolopoulos)· So what happened to the signage that appeared in September 2014?
A· · **I don't know.**
Q· · Who would know?
A· · I don't know.[36]

In his second declaration, executed in rebuttal a month after the deposition, Mr. Neidich admits that the above Google Street View dated October 2014 "appears to be a photograph of our restaurant during our soft opening. As can be seen in the photograph, the interior of the restaurant is finished at this time."[37] He continues:

3. At night, customers, and our lights would be seen in the restaurant at the time this photograph was taken (we were only open at night), because paper only covered a portion of the windows, which was intentional.

4. The restaurant was open and serving customers at the time of this photograph, while paper covered the bottom half of the windows.

5. Thus, as I testified previously, we were open and providing customers with restaurant and bar services at least as early as September of 2014.[38]

Mr. Neidich's testimony as Petitioner's owner and CEO was marred by other gaps, as well. He testified that the head bartender and chef provided services in September 2014,[39] but did not recall when the head bartender started providing services for the bar and restaurant,[40] did not know if there were only two employees working there

---

[35] Neidich dep. 58:14-24, 32 TTABVUE 59 (emphasis added).

[36] Neidich dep. 59:12-16, 32 TTABVUE 60 (emphasis added).

[37] Second Neidich declaration, ¶2, 35 TTABVUE 8. Exhibit K to the Neidich deposition is designated as Exhibit J to Respondent's second NOR, 34 TTABVUE 137-38.

[38] Second Neidich declaration, ¶¶3-5, 35 TTABVUE 8.

[39] Neidich dep. 40:2-4, 32 TTABVUE 41.

[40] Neidich dep. 39:7-19, 32 TTABVUE 40.

in September 2014,[41] and did not produce employee pay stubs showing payment to employees in September 2014.[42] The restaurant had a liquor license and a trash contract by September 2014,[43] but he did not know if it had a certificate of occupancy, an alarm permit, health permits, a sales tax permit, insurance, or ADA certification by then.[44]

### 2. Fitzgerald Testimony

John Fitzgerald, a friend and former college classmate of Mr. Neidich, states in his testimonial declaration that:

> 2. I have been a customer of **JNF, LLC** (owner of the restaurant THE HAPPIEST HOUR) since at least September 2014.
>
> 3. In September of 2014, on multiple occasions, I visited, went to, and received restaurant services at THE HAPPIEST HOUR located at 121 W 10th St, New York, NY 10011.
>
> 4. Even prior to my visits in September 2014, I became aware that THE HAPPIEST HOUR was rendering restaurant services at this location.
>
> 5. **Prior to October 6, 2014**, I visited THE HAPPIEST HOUR restaurant and received restaurant services around 5 times.
>
> 6. On multiple occasions, I brought my now wife (at that time girlfriend) and other friends.
>
> 7. While there, I purchased food and drinks, and then proceeded to eat this food and drink these drinks at THE HAPPIEST HOUR. I ate a number of different menu items, including cheeseburgers ("The Happiest Burger"), salt and pepper broccoli, chicken bites, kale salad, a drink called Maid to Order, a drink called El Diablo, among other things.
>
> 8. I ordered all the above off THE HAPPIEST HOUR menu.

---

[41] Neidich dep. 47:6-8, 32 TTABVUE 48.

[42] Neidich dep. 47:2-5, 32 TTABVUE 48.

[43] Neidich dep. 48:1-7, 32 TTABVUE 49.

[44] Neidich dep. 47:9-11, 22-25, 48:8-13, 50:3-5, 32 TTABVUE 48-51.

9. Multiple other patrons were at THE HAPPIEST HOUR ordering food and drink on the occasions I visited there **prior to October 6, 2014**.[45]

John Fitzgerald testified at deposition that he and Jon Neidich "went to college together, we were friends."[46] When asked who contacted him about preparing his declaration, he answered, "I believe I spoke directly to Mr. Skale [Petitioner's counsel]."[47] When Respondent's counsel asked about the second paragraph of his declaration, "you say a customer of JNF, LLC, you don't say a customer of The Happiest Hour, is there a difference, did you mean anything by that?" he answered, "what I mean is a customer of the restaurant, The Happiest Hour, Jon—which is my friend, Jon Neidich's restaurant."[48] He did not know when the restaurant opened for business,[49] nor could he identify specific dates he was a customer there.[50]

He was asked why he specified Respondent's constructive use date:

Q And why do you mentioned October 6th, what's
the significance of that date?
A· ·That was the date that I put in the
declaration that -- I guess it was to define -- it
was the -- the end of September, middle/end of
September and into the first few days of October.
Q· ·But you don't know specifically why you
included the 6th on this declaration?
A· ·I don't recall.[51]

Q…Do you know approximately how many

---

[45] Fitzgerald declaration, Petitioner's first NOR, 28 TTABVUE 23-24 (emphasis added).

[46] Fitzgerald dep. 9:25-10:1, 31 TTABVUE 10-11.

[47] Fitzgerald dep. 17:3-6, 31 TTABVUE 18.

[48] Fitzgerald dep. 17:19-25, 31 TTABVUE 18.

[49] Fitzgerald dep. 14:5-7, 31 TTABVUE 15.

[50] Fitzgerald dep. 14:11-13, 17:11-15, 31 TTABVUE 15, 18.

[51] Fitzgerald dep. 21:21-22:4, 31 TTABVUE 22-23.

times you went to The Happiest Hour in the month of
September 2014?
A· ·I would say that I went to Happiest Hour and
received restaurant services around five times prior
to October 6th, so -- 2014, so I'm not sure. I
wouldn't be able to define those -- those dates, but
in September and the first few days of October.[52]

Due to the passage of time, he could not recall the specifics of each visit:

A· ·Yeah, I can't recall the first versus the
second or the third, but I think that probably the
first time I went through was with just my wife or
just a friend, but I think -- yeah, it's hard for me
to define when and to recall that, it being  six
plus years ago.[53]

But he understood that it was a "soft opening" for friends and family:

A· ·Yes, the first few times that I went, it was
my understanding that The Happiest Hour was in a soft
opening phase, as I understand the term soft opening,
and I was going to The Happiest Hour for kind of a
soft opening.
Q· ·And, again, I'm not holding you to any
definition of soft opening, but is it your
understanding that it was like a friends and family
type night the first time you went?
A· ·Yeah, I think -- I think **friends and family**,
soft opening to kind of -- the words perhaps are
interchangeable in a lot of ways.[54]

### 3.    Discussion and Analysis

Respondent argues that "[t]he credibility of Neidich as the spokesperson for the

Petitioner is very much at issue in this proceeding, and it serves to taint nearly all of

---

[52] Fitzgerald dep. 21:13-20, 31 TTABVUE 22.

[53] Fitzgerald dep. 22:18-23, 31 TTABVUE 23.

[54] Fitzgerald dep. 19:2-13, 31 TTABVUE 20 (emphasis added).

his testimony and proffered evidence."[55] "If anything is suspicious, it is the fragmented evidence submitted by the Petitioner which is full of holes and bereft of the indicia that would usually accompany a restaurant that was actually doing business."[56] Mr. Neidich did not recall or produce evidence of numerous such indicia, Respondent contends, such as: employee payroll records from September/early October; a certificate of occupancy; an alarm permit; health permits; a liquor license; a sales tax permit; insurance; ADA certification; and records of restaurant sales.[57]

We agree. "[W]hile a party is entitled to carry its date of first use back of one so asserted, proof of such earlier date must be **clear and convincing** and **oral testimony given long after the date sought to be proved must be carefully scrutinized**." *Rockwood Chocolate Co. v. Hoffman Candy Co.,* 372 F.2d 552, 152 USPQ 599, 600 (CCPA 1967) (emphasis added); *see also Elder Mfg. v. Int'l Shoe,* 92 USPQ at 332-33 ("Moreover, oral testimony given long after the event, while entitled to consideration, should be carefully scrutinized, and, if it does not carry conviction as to its accuracy and applicability, it should not be sufficient to successfully establish a date of first use prior to that alleged in the trade-mark application.").

### a. Proof of Actual Use

A mark is deemed to be in use in commerce "on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce…." 15 U.S.C. § 1127. Thus, the statute imposes two requirements: A mark

---

[55] Respondent's brief, 37 TTABVUE 13.

[56] Respondent's brief, 37 TTABVUE 13.

[57] Respondent's brief, 37 TTABVUE 17, 21.

is used in commerce on services when [1] it is used or displayed in the sale or advertising of services and [2] the services are rendered in commerce. *Couture v. Playdom, Inc.,* 778 F.3d 1379, 113 USPQ2d 2042 (Fed. Cir. 2015); *accord Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.,* 859 F.3d 1023, 123 USPQ2d 1024, 1027 (Fed. Cir. 2017); *Mars Generation v. Carson,* 2021 USPQ2d 1057, at *21. "Normally, because of the intangible nature of services, it is not possible to affix a mark to them, as can be done in the case of goods. As a result, Section 45 of the Trademark Act defines service mark use as occurring when a mark 'is used or displayed in the sale or advertising of services and the services are rendered in commerce....'" *In re Metriplex, Inc.*, 23 USPQ2d 1315, 1316-17 (TTAB 1992).

Under the first requirement, Petitioner has not proven that it displayed THE HAPPIEST HOUR in external signage prior to Respondent's October 6, 2014 constructive use date. Mr. Neidich's assertion to this effect crumbled under cross-examination, and his second declaration effectively concedes that his restaurant lacked external signage then.[58] Petitioner concedes that "Mr. Neidich might have misremembered the time when the signage was installed on the building," and "the signage itself was not yet on the building…."[59]

---

[58] Second Neidich decl. ¶ 2, Petitioner's third NOR, 35 TTABVUE 8.

[59] Petitioner's brief, 36 TTABVUE 10, 25. In its reply brief, Petitioner belatedly attempts to question the reliability of Google Street View dating, *see* Petitioner's reply brief, TTABVUE 3, 11. But "[o]bjections raised for the first time in a reply brief are untimely because they effectively foreclose the adverse party from responding to the objections." *Grote Inds., Inc. v. Truck-Lite Co., LLC*, 126 USPQ2d 1197 (TTAB 2018), *judgment rev'd and vacated by consent decree*, No. 1:18-cv-00599 (W.D.N.Y. June 8, 2022); *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1104 (TTAB 2007). And Petitioner relies on information from Google— "How Images are Collected, Historical Images" Support.Google.com—that it did not introduce at trial. *See Hole in One Drinks, Inc. v. Lajtay*, 2020 USPQ2d 62534, * 2 (TTAB 2020) (a brief

Mr. Neidich's testimony about the restaurant's menus suffers from similar deficiencies. He testified that Petitioner had over 200 menus printed for the soft opening.[60] A menu bearing a restaurant's service mark can constitute a display or advertising using the mark for restaurant services. *See Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, at *16 (citing TMEP § 1301.04(a) (July 2021)). But Mr. Neidich did not testify that the 200 menus bore the mark THE HAPPIEST HOUR. He testified that the September 22, 2014 draft menu shown above[61] was "a finalized version of the menu," and that many of the items on that menu were served in September 2014,[62] but did not testify that that draft menu was shown to the soft opening guests in that form. He admitted that his menu was in draft form on September 22, 2014;[63] he did not recall who printed the menus;[64] and he was still deciding on various brand logos and styles that month.[65]

Unlike *Peterson v. Awshucks*, 2020 USPQ2d 11526, at *16, where "the evidence of record, including the testimony and documentary evidence, shows use of the mark at the King Street location on window signs, and on menus…," Petitioner's evidence that it displayed its mark on the restaurant premises during the soft opening is contradictory, inconsistent, and indefinite. *See Martahus v. Video Duplication Svcs.*,

---

may not be used as a vehicle for introducing evidence). Petitioner's arguments and evidence regarding the reliability of the Google Street View evidence therefore will not be considered.

[60] Neidich dep. 43:44:9-13.

[61] Petitioner's first NOR, ex. I, 28 TTABVUE 65, authenticated as a business record in the second Neidich testimonial declaration, ¶1, 35 TTABVUE 7.

[62] Neidich dep. 54:7-16, 54:23-55:4-16, 32 TTABVUE 55-56.

[63] Neidich dep. 54:7-16, 32 TTABVUE 55.

[64] Neidich dep. 44:2-3, 32 TTABVUE 45.

[65] Neidich dep. 53:6-54:16, exs H and I, 32 TTABVUE 55, 95-105.

27 USPQ2d at 1852 n. 7 ("VCDS has not provided in the record before us clear and convincing evidence that VCDS installed a sign bearing the 'VCDS' mark at its office prior to May 1, 1985, or that such an installation would have amounted to service mark use.").

Petitioner contends that on its claimed date of first use, September 7, 2014, it "issued a press release concerning the opening [of] THE HAPPIEST HOUR restaurant. At that time, we open [sic] and available to taking reservations for anyone that contacted us in response to the press release."[66] Petitioner submits an August 31, 2014 email from its publicist, Hanna Lee, sending the press release to a New York Times contributor, Ben Detrick.[67] Her email is unsupported by a declaration, and is inappropriate for a notice of reliance, as it is not a printed publication available to the general public in libraries or of general circulation among members of the public. *See* Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e). We accord this evidence no probative value.

Mr. Neidich further testified that "[t]here was a press release in the New York Times that stated that we were opening."[68] This refers to the September 2, 2014 Times article listing THE HAPPIEST HOUR among a dozen new opening bars in the city.[69] This article is not technically a "press release," and it does not constitute Petitioner's advertising. *Cf.* TMEP § 1301.04(a) ("press releases sent exclusively to

---

[66] Neidich amended decl. ¶ 7, 30 TTABVUE 18.

[67] Petitioner's first NOR ex. D (Hanna Lee email with press release), 28 TTABVUE 25-28, 52-54.

[68] Neidich dep. 36:16-17, 32 TTABVUE 37.

[69] NYTimes.com, Petitioner's first NOR, ex. F, 28 TTABVUE 48-49.

news media, or printed articles resulting from such releases are not acceptable [as specimens of use] because they do not demonstrate the required use of the mark by the applicant."). It is, however, a printed publication available to the general public in libraries or of general circulation among members of the public, and is thus appropriate for inclusion in a notice of reliance. *Sw. Mgmt., Inc. v. Ocinomled, Ltd. & Emeril's Food of Love Prods., LLC*, 115 USPQ2d 1007, 1013 (TTAB 2015) ("News articles from publications of general circulation … are admissible without authentication for what they show on their face," citing Trademark Rule 2.122(e)). Even so, as we find below, the article is not evidence of actual, technical trademark use; we discuss it instead as part of Petitioner's claim of analogous use.

Moreover, Mr. Neidich also agreed that a restaurant review published on October 22, 2014 stated "Acme's Jon Neidich Opens His Retro Tropical Bar The Happiest Hour Next Week in the Village."[70] This was consistent with an October 29, 2014 Zagat article suggesting a recent opening and THE HAPPIEST HOUR's October 31, 2014 Facebook posting stating "We're now open!"[71] All of which is inconsistent with Petitioner's claim that its restaurant was open earlier.

Advertising and preparatory measures, such as taking reservations, may precede the rendering of services, but they are not the same as **rendering** those services. As the Federal Circuit made clear in *Couture v. Playdom,* the statutory language in 15 U.S.C. § 1127 requiring that "the services are rendered" reflects the nature of trademark rights:

---

[70] Neidich dep. 51:4-52:11 and ex. F (Eater.com) 32 TTABVUE 52-53, 91-92.

[71] Neidich dep. exs. E and H, 32 TTABVUE 90, 94.

> There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed.... [T]he right to a particular mark grows out of its use, not its mere adoption....
> *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

*Couture v. Playdom,* 113 USPQ2d at 2043-44; *accord Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.,* 123 USPQ2d at 1029 ("mere preparation and publication of future plans do not constitute use in commerce"); *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 90 USPQ2d 1301, 1307 (Fed. Cir. 2009) ("Mere adoption (selection) of a mark accompanied by preparations to begin its use are insufficient for claiming ownership of and applying to register the mark."); *Mars Generation v. Carson,* 2021 USPQ2d 1057, at *21.

Petitioner's testimony, offered years after the fact, is impaired by its owner's lack of knowledge of key aspects of his business and his lack of credible corroborating documentation. His testimony "carries no conviction of its accuracy and is grossly evasive, inconsistent, and self-serving." *Fuji Med. Instruments Mfg. Co., Ltd.*, 2021 USPQ2d 831, * 28 (TTAB 2021) (citing *Baker v. Lebow*, 66 USPQ at 236). Testimony regarding events from years before, uncorroborated by documents showing use of the mark before the critical date, is insufficient to prove a prior date of use by clear and convincing evidence. *Am. Hygienic Labs. Inc. v. Tiffany & Co.,* 12 USPQ2d 1979, 1984 (TTAB 1989). "In addition, we cannot ignore [Petitioner's] lack of any records or other documentation corroborating [its] testimony.... The presence of business records would strengthen the case that these transactions occurred in the ordinary course of trade, and the absence of such records does the opposite." *Tao Licensing, LLC v. Bender Consulting Ltd.,* 125 USPQ2d 1043, 1053 (TTAB 2017); *Elder v. Int'l Shoe*, 92

USPQ at 333 ("Oral testimony is obviously strengthened by corroborative documentary evidence.").

Jon Neidich's college friend, John Fitzgerald, first contacted by Petitioner's counsel, chimes in with a declaration that pointedly names "JNF, LLC" as the owner of the restaurant and claims five visits to the restaurant in the three-week period just before the "October 6, 2014" critical date. But he too complains that he is endeavoring to recall events from years ago: "[I]t's hard for me to define when and to recall that, it being … six plus years ago."[72] "[N]ot only lapse of time but all the circumstances discussed above indicate the likelihood that the recollection of the witnesses may be faulty." *Elder Mfg. v. Int'l Shoe,* 92 USPQ at 334. And his testimony is conclusory: he offers no explanation of how the mark was displayed, if at all, in connection with restaurant and bar services, or whether his recollection is simply retrospective, identifying what he now knows to be THE HAPPIEST HOUR restaurant and bar. "Here the witness was doubtful. Here he depended upon his memory…. Other circumstances herein pointed out, we think, suggest that the offered proof does not meet the heavy burden placed upon [Petitioner]." *Baker Co. v. Lebow*, 66 USPQ at 236.

Taken as a whole, Petitioner's proof is not clear and convincing. Rather, it is characterized by contradictions, inconsistencies, and indefiniteness. *Elder Mfg. v. Int'l Shoe,* 92 USPQ at 332; *Baker v. Lebow*, 66 USPQ at 236; *Threshold.TV v. Metronome,* 96 USPQ2d at 1036. On this record, we cannot find that the soft opening took place before October 6, 2014.

---

[72] Fitzgerald dep. 22:18-23, 31 TTABVUE 23.

### b. Proof of Analogous Use

Petitioner contends in the alternative that it can prove priority via its pre-opening advertising of THE HAPPIEST HOUR restaurant and bar.[73] As noted, mere advertising without rendering services under the mark would not constitute technical trademark use sufficient to support registration of the mark; but it could, in some circumstances, constitute use analogous to technical trademark use, sufficient to prove priority in an *inter partes* proceeding. *Malcolm Nicol & Co. v. Witco Corp.*, 881 F.2d 1063, 11 USPQ2d 1638, 1639 (Fed. Cir. 1989); *L. & J.G. Stickley, Inc. v. Cosser*, 81 USPQ2d 1956, 1968 (TTAB 2007). As the Board has explained:

> Use analogous to trademark use, in contrast, is non-technical use of a trademark in connection with the promotion or sale of a product [or service] under circumstances which do not provide a basis for an application to register, usually because the statutory requirement for use on or in connection with the sale of goods [or services] in commerce has not been met. Although never considered an appropriate basis for an application to register, such use has consistently been held sufficient use to establish priority rights as against subsequent users of the same or similar marks.

*Shalom Children's Wear Inc. v. In-Wear A/S*, 26 USPQ2d 1516, 1519 (TTAB 1993) (use analogous may establish priority over constructive use filing date of intent-to-use application).

Reliance on priority through analogous use must be pleaded. *Central Garden & Pet Co. v. Doskocil Mfg. Co., Inc.*, 108 USPQ2d 1134, 1142 (TTAB 2013). Petitioner did not do so.[74] We must therefore determine if the issue has been tried by implied consent under Fed. R. Civ. P. 15(b)(2). *Id. Morgan Creek Prods. Inc. v. Foria Int'l Inc.*,

---

[73] Petitioner's brief, 36 TTABVUE 26, Petitioner's reply brief, 40 TTABVUE 8-10.

[74] Petition for Cancellation, 1 TTABVUE.

91 USPQ2d 1134, 1138 (TTAB 2009) ("Fed. R. Civ. P. 15(b) provides, in pertinent part, that when issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). Implied consent can only be found where the non-offering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue. *Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 2020 USPQ2d 10914, *3 (TTAB 2020) *aff'd in part, vac. in part*, 2021 USPQ2d 1069 (Fed. Cir. 2021).

Petitioner introduced evidence of its press release and pre-opening publicity.[75] Respondent addressed the issue of analogous use at length in its brief.[76] Respondent even framed the issues as follows: "Whether Petitioner has met its burden to prove that: (a) it used THE HAPPIEST HOUR in interstate commerce prior to Registrant's filing date for its mark HAPPIEST HOUR; and [(b)] whether Petitioner has met its burden to prove use-analogous-to-trademark use prior to Registrant's filing date for its mark HAPPIEST HOUR."[77] We find that this accurately frames the issues, including use analogous, which has been tried by implied consent. Petitioner's pleadings are deemed amended accordingly under Fed. R. Civ. P. 15(b). *Id.*; *see also Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1632-33 (TTAB 2007). *See generally* TBMP § 507.03(b) (2021).

---

[75] Petitioner's first NOR, exs. E-G, 28 TTABVUE 29-54.

[76] Respondent's brief, 37 TTABVUE 12-13, 15, 17, 20-21.

[77] Respondent's brief, 37 TTABVUE 9.

Analogous use is "any non-technical use of a mark which is sufficient to create in the mind of the relevant public an association between the goods and their source. … Thus, even before proper trademark use commences, advertising or similar pre-sale activities may establish priority if they create the necessary association in the mind of the consumer." *Doskocil*, 108 USPQ2d at 1142 (citing 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:14).

As the Federal Circuit has made clear, however, "[b]efore a prior use becomes an analogous use sufficient to create proprietary rights, the petitioner must show prior use sufficient to create an association in the minds of the purchasing public between the mark and the petitioner's goods." *T.A.B. Systems v. PacTel Teletrac*, 77 F.3d 1372, 37 USPQ2d 1879, 1883 (Fed. Cir. 1996). The Court has stressed the burden this imposes:

> An unbroken line of precedents of both this court and the Board make clear that activities claimed to constitute analogous use must have substantial impact on the purchasing public.

*Id.* at 1882.
> …
> In other words, advertising of sufficient clarity and repetition to create the required identification must have reached a substantial portion of the public that might be expected to purchase the service. Thus, the user must prove that the necessary association was created among more than an insubstantial number of potential customers. Otherwise, he cannot show significant impact on the purchasing public.

*Id.* at 1883 (internal punctuation omitted) *quoted in Westrex Corp. v. New Sensor Corp.*, 83 USPQ2d 1215, 1219 (TTAB 2007). "[T]he activities claimed to create such an association must reasonably be expected to have a substantial impact on the purchasing public before a later user acquires proprietary rights in a mark." *Herbko v. Kappa Books,* 64 USPQ2d at 1378.

Petitioner must therefore show that its promotional activities had this impact on the purchasing public, who are members of the general public, prior to Respondent's October 6, 2014 constructive use date. And it must do so by a preponderance of the evidence. Since use analogous to technical trademark use would not support registration, Petitioner's assertion of pre-opening advertising is not inconsistent with its original claimed date of actual first use. Hence, the usual preponderance of evidence standard applies to its analogous use claim. *See L. & J.G. Stickley v. Cosser,* 81 USPQ2d at 1968.

Petitioner's evidence consists of its September 7, 2014 press release,[78] a September 2, 2014 NEW YORK TIMES article listing THE HAPPIEST HOUR among over a dozen soon-to-open bars,[79] and an August 24, 2014 Grubstreet.com article listing it among twenty bars and restaurants.[80] The press release, however, was not properly introduced in evidence under Trademark Rule 2.122(e), does not identify the publications, if any, to which it was sent, and does not show that the release was promulgated to the consuming public before October 6, 2014—the critical date. There is "no evidence that any media organizations in fact published or broadcast the information the release contained" by that date, and no evidence of how many potential customers it eventually reached. *T.A.B. v. PacTel Teletrac,* 37 USPQ2d at 1882-84. Mr. Neidich could not recall any public response to the press release:

> Q· · Okay. · Do you recall, before your grand
> opening, how many people contacted you about the press
> release?

---

[78] Ex. G, Petitioner's first NOR, 28 TTABVUE 52-54.

[79] Ex. F, Petitioner's first NOR, 28 TTABVUE 47-51.

[80] Ex. E, Petitioner's first NOR, 28 TTABVUE 29-35.

A· ·I can't recall.
Q· ·Do you recall if there were any people -- let
me ask it this way, was the phone operating at the
time?
A· ·Yes.
Q· ·Was there a phone?
A· ·Yes.
Q· ·And would the press release have shown the
phone number?
A· ·I can't recall.
Q· ·So do you remember anyone calling you saying,
hey, I heard some -- I saw some press release about
your business being opened and trying to confirm that
it was opened, do you recall any such occurrence?
A· ·I can't recall.[81]

The NEW YORK TIMES and GRUBSTREET articles "were not advertisements per se but news articles," *id*. at 1881, but even if they are treated as "in effect, press releases" the mark THE HAPPIEST HOUR "was buried in the body of the articles." *Id*. at 1881-82.

The Federal Circuit in *Teletrac* quoted a precedent that bears on the present case: *Old Swiss House, Inc. v. Anheuser-Busch, Inc.,* 569 F.2d 1130, 196 USPQ 808, 810 (CCPA 1978). There, the petitioner, Old Swiss House, Inc., rendered restaurant services in Fort Worth, Texas under the trade name Old Swiss House. The registrant owned a restaurant called The Old Swiss House, located in Busch Gardens in Tampa Florida. Even though the petitioner claimed to have used the trade name since May 1964, the registrant, which opened its restaurant in September 1964, claimed that "its rights are superior by virtue of this prior use of the mark in publicizing its still unopened business." *Id*. at 810. Its publicity consisted in the main of "12 articles, each

---

[81] Neidich dep. 38:10-39:2, 32 TTABVUE 39-40.

published only once, which appeared in various newspapers and trade journals between December 27, 1963, and April 11, 1964….” *Id*. The Court found this evidence of analogous use wanting:

> The articles mentioned above were, in effect, press releases; in all but one, the mark, The Old Swiss House, was buried in the body of the articles. This, in our view, is not the type of public exposure of a mark that would be expected to have any significant impact on the purchasing public.

*Id. quoted in T.A.B. v. PacTel Teletrac,* 37 USPQ2d at 1881-82.

So too here. Petitioner's prior publicity was not sufficiently clear, widespread and repetitive to create the required association in the minds of the potential purchasing public between the mark as an indicator of a particular source and the service to become available later. *Id*. at 1882. It fails to prior prove analogous use by a preponderance of the evidence.

## IV.     Conclusion

Taking all the strengths and weaknesses of the evidence into account, we find that Petitioner has failed to establish prior use or analogous use of its pleaded mark THE HAPPIEST HOUR in connection with restaurant and bar services versus Respondent's constructive use date for its HAPPIEST HOUR mark.

**Decision**: The Petition to cancel Registration No. 5008661 for HAPPIEST HOUR is denied.